UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA,           :

    -against-                                           :           15 CR 348 (ERK)

JOVAN RENDON-REYES                    :

               Defendant.           :
-------------------------------------------------------x

## SENTENCING MEMORANDUM ON BEHALF OF DEFENDANT JOVAN RENDON-REYES

Dated: New York, New York
       December 5, 2018

Respectfully submitted,

**RICHARD B. LIND, ESQ.**
575 Lexington Avenue
New York, NY  10022

*Attorney for Defendant
Jovan Rendon-Reyes*

# RICHARD B. LIND

ATTORNEY AT LAW

575 LEXINGTON AVENUE

4TH FLOOR

NEW YORK, N.Y. 10022

TELEPHONE (212) 888-7725

E-MAIL: rlind@lindlawyer.com

WEBSITE: www.richardlindlawyer.com

December 5, 2018

*By ECF & FedEx*

Hon. Edward R. Korman
United States District Judge
U.S. Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. Jovan Rendon-Reyes
               15 CR 348 (ERK)

Dear Judge Korman:

      This letter is submitted on behalf of defendant Jovan Rendon-Reyes ("Jovan"), who is scheduled to be sentenced by this Court on Wednesday, December 12, 2018. For the reasons set forth below, we urge the Court to impose a sentence below the applicable Guidelines range; specifically, we seek the statutory minimum sentence of fifteen years' imprisonment.

## BACKGROUND

### I.    JOVAN'S GUILTY PLEA

      As the presentence report ("PSR") indicates, on April 5, 2017, pursuant to a plea agreement with the government (the "Plea Agreement"), Jovan pled guilty to Counts One and Fourteen of a 29-count Superseding Indictment (the "Indictment"), before Magistrate Judge Vera M. Scanlon. **Count One** of the Indictment alleges that between December 2004 and November 2015, Jovan, together with several brothers and relatives , namely, co-defendants Saul Rendon-Reyes ("Saul"), Guillermina Rendon-Garcia (Guillermina"), Francisco Rendon-Reyes, Jose Rendon-Garcia ("Jose"), Felix Rojas ("Felix"), Odilon Martinez-Rojas ("Odilon"), Severiano Martinez-Rojas ("Severiano"), together with others, being persons employed by and associated with what the PSR terms the "Rendon-Reyes Trafficking Organization," (the "Organization"), participated in the affairs of the

Organization through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1961 and 1961(5). PSR ¶ 1.

Jovan also admitted to the following Racketeering Acts within Count One:

**Racketeering Act 3(a)**, which alleges that Jovan, co-defendants Odilon and Severiano, together with others, recruited, harbored, enticed, harbored, transported, provided and obtained **Jane Doe # 1**, and did benefit financially from participation in such acts, knowing that force, fraud and coercion would be used to cause Jane Doe # 1 to engage in one or more sex acts, in violation of 18 U.S.C. §§ 1591(a)(1) and 1591(a)(2);

**Racketeering Act 7(a)**, which alleges that between June 2007 and February 2009, Jovan, and co-defendants Odilon, Guillermina, Jose, and Felix harbored, transported, provided and obtained by any means a person, specifically **Jane Doe # 5**, knowing that force, fraud, and coercion would be used to cause **Jane Doe # 5** to engage in one or more commercial sex acts , and (2) **Jane Doe # 5** had not attained the age of 18 years and would be caused to engage in one or more commercial sex acts in violation of Sections 1591(a)(1) and 1591(a)(2).

**Racketeering Act 8(a)**, which alleges that between November 2007 and February 2010, Jovan, and co-defendants Jose, Felix, Odilon and Severiano, recruited, enticed, harbored, transported, etc., **Jane Doe # 6**, to engage in commercial sex acts, in violation of Sections 1591(a)(1), and 1591(a)(2). PSR ¶ 1.

<u>Count 14</u> charges that between June 2007 and February 2009, Jovan, and co-defendants Guillermina, Jose, and Odilon recruited, enticed, harbored, etc., **Jane Doe # 5** to engage in commercial sex acts., in violation of 1591(a)(1), 1591(a)(2), 1591 (b)(1), and 1591(b)(2). PSR ¶ 2.

The Indictment also contains forfeiture allegations, to which Jovan admitted. PSR, ¶¶ 5, 151.

The Plea Agreement for Jovan stipulates an adjusted offense level of 40, which carries a range of imprisonment of 292-365, and a further reduction of one level, to an imprisonment range of 262-327 months' incarceration in the event Jovan timely pled guilty – which he did. *See* Plea Agreement at 5.[1]

---

[1] The PSR's calculations differ to a degree. It imposes a two-level enhancement for "vulnerable victim," as to sex trafficking of **Jane Doe # 5,** *see* PSR ¶¶ 68-74, which is not imposed in the Plea Agreement (*see id.* at 4). In addition the PSR does not deduct two levels for global plea, unlike the Plea Agreement which does. *See* Plea Agreement at 5.

## II.   JOVAN'S ALLEGED OFFENSE CONDUCT

The PSR contains a lengthy description of "Offense Conduct" allegedly committed by the defendants with respect to the various Jane Does, including beatings, sexual assaults, and other violent acts. With respect to **Jane Doe # 1**,[2] the PSR's account is limited to an assertion that Jovan helped Odilon to prostitute **Jane Doe # 1**, "by providing her with housing, condoms and lubricant, and collecting some of her proceeds in both Atlanta in early 2005 and New York in July 2005." PSR ¶ 13.

The PSR states that Jovan met **Jane Doe # 5** in 2007; he asked her to "elope" with him and be his girlfriend. Soon thereafter, Jovan took her to Puebla, Mexico, and forced her to have sex with him; she was also barred from calling her parents. Jovan allegedly forced her to prostitute herself for the next six months. In January 2008, Jovan told **Jane Doe # 5** he was sending her to the United States; and shortly after her arrival, she was forced to prostitute for him. Once Jovan arrived in the United States, he forced **Jane Doe # 5** to continue to prostitute for him. PSR ¶¶ 24-25.

As to **Jane Doe # 6**, Jovan purportedly held her son hostage to force her to prostitute in Guanajuato, Mexico, under Felix's direction. In addition, Jovan allegedly assisted Felix to smuggle her into the United States. PSR ¶ 26.

In summary, the PSR contends that Jovan and other family members were involved in an extensive sex trafficking ring, which resulted in the recruitment and transportation of ten "Jane Does" from Mexico to the United States. PSR ¶ 48.

## III.   JOVAN'S BACKGROUND

### A.   Personal and Family Data

Jovan was born in San Miguel, Tenancingo, Tlaxcala, Mexico, in April 1986. He is one of five children born to the marital union between Pedro Rendon and Marianna Reyes Parada. Jovan's father died in 2005, apparently from diabetes complications; prior to his demise, Pedro was a mason. Jovan's mother (age 63) is currently incarcerated in Mexico on related charges to the instant offense. Prior to her arrest, she was financially supported by Jovan's siblings. Jovan has four siblings; three of whom -- Guillermina, Saul and Francisco -- are incarcerated at the MDC. The fourth, Zuleica Rendon-Reyes, resides in San Miguel, Mexico, and is married with three children. Jovan also has a maternal half-sibling, Aledjandro Reyes, who is married with one child. According to Jovan, Alejandro had been employed at a restaurant in the United States and was deported after the brothers were arrested. PSR ¶¶ 112-13.

Jovan told Probation he was raised in an intact poor household in San Miguel, Tenancingo, Mexico. He noted that his childhood was sad, because his father was an

---

[2] Our summary is limited to the three Jane Does as to whom Jovan admitted in his guilty plea.

3

alcoholic who would physically assault Jovan's mother. The father also physically abused the defendant and his and his siblings twice per week. Jovan recalled that his father would hit them with a rope, electrical cord or a wooden stick. Jovan stated that they "were often bruised as a result of the abuse, but the limited amount of doctors in their town prevented them from being able to receive medical treatment." PSR ¶ 114. Jovan described his childhood home as having one room with no electricity or running water. *Id.*

In addition, as detailed in the comprehensive sentencing memorandum on behalf of defendant Felix Rojas,[3] Jovan was born in the region of Tenancingo, which has been described as the "epicenter of sex trafficking" and as "Pimp City." Prostitution is legal in Mexico and legal officials turn a blind eye to the industry.

Jovan was romantically involved with Sandra Estrada from 1999 to 2015; their relationship produced one child, who lives with Ms. Estrada, is healthy, and is enrolled in school; she is presently having difficulty supporting the child without financial support; but she remains supportive of Jovan. From 2009 to 2013, Jovan was romantically involved with Elma Sanchez Magana; but she ended that relationship because of Jovan's romantic involvement with another woman, and because she was forced to prostitute herself. Two children, ages eight and five, resulted from this relationship. The children live with their maternal grandmother. As Ms. Magana Sanchez is a victim of the instant offense, she is aware of Jovan's arrest and conviction. In 2010, Jovan became romantically involved with a third woman, Araceli Hernandez Barbosa, who is employed by a hotel in Mexico; she is aware of Jovan's arrest and conviction and remains supportive of him. PSR ¶¶ 115-17.

Jovan was raised in San Miguel and illegally emigrated to the United States on four occasions from the age of 13 to 23, primarily for employment, but returned to Mexico typically because of illnesses in the family. According to the ICE database, Jovan is illegally residing in the United States, and is subject to deportation.

### B. Jovan's Health; Substance Abuse

Jovan is physically and mentally healthy. Jovan first used crack cocaine when was fifteen, and the frequency increased to three times per weekend; this escalated to three times per week at the time of his arrest in this case. Jovan informed that on one occasion he was hospitalized because of an overdose for two days in Mexico in 2008; he had to have his stomach pumped. Jovan is open to treatment. PSR ¶¶ 121-25.

### C. Educational & Employment Background

Jovan attended first through sixth grades in San Miguel. Jovan was employed with his father as a mason and cattle farmer from age seven to twelve. As recounted in the PSR, at age 13, Jovan immigrated to the United States at age 13, and was employed as a dish washer in a restaurant; at age 15, he re-entered this country and was employed as a

---

[3] *See United States v. Felix Rojas*, 15 Cr. 348 (ERK), Doc. # 112 (filed 12/4/2018), at 2-4, and Exhibit A,

4

RICHARD B. LIND

delivery person for a deli. When Jovan entered the United States illegally at age 20 and 23, he was supported by either his sister, or his girlfriend, Elma Sanchez. For more than seven years, prior to his arrest, Jovan was employed as a taxi driver in Tenancigo. PSR ¶¶ 126-28.

## DISCUSSION

### POINT ONE

### JOVAN DISPUTES THE "VULNERABLE VICTIM" ENHANCEMENTS STATED IN THE PSR AND THE PLEA AGREEMENT

Jovan challenges portions of page 4 of the Plea Agreement, and paragraphs 64, 71, and 77 of the PSR, which advocate a two-level vulnerable victim enhancement, pursuant to U.S.S.G. § 3A1.1.[4] That Section provides in part that a " 'vulnerable victim' means a person (A) who is a victim of the offense of conviction [ ... ] and (B) who is *unusually* vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." § 3A1.1 (cmt.) n. 2. (emphasis added).

Typically in sex trafficking cases like this, the victims are unusually vulnerable due to their homelessness, and/or dependence on drugs or alcohol. *See, e.g., United States v. Irving,* 554 F.3d 64, 75 (2d Cir. 2009) ("children who were homeless and were without parental or other appropriate guidance made them unusually vulnerable, independently of their ages"); *United States v. Royal*, 442 F. App'x 794, 797-98 (4th Cir. 2011)("You had a couple, probably all three of the minors come, from dysfunctional families.... They were allowed to roam and hit the streets, and one was living essentially in a dumpster almost....The record reflects that within hours of meeting each of the victims, Royal knowingly exploited their dependence on drugs and alcohol by supplying each victim with alcohol, marijuana, cocaine, PCP or ecstasy. Throughout Royal's sexual exploitation of the victims, he continued to provide drugs and alcohol. As such, Royal took advantage of each victim's drug dependence vulnerability"); *United States v. Evans,* 272 F.3d 1069, 1091 (8th Cir. 2001) (victim vulnerable to sex trafficking because defendant knew she was drug-addicted and provided her drugs); *United States v. Amedeo,* 370 F.3d 1305, 1317–18 (11th Cir. 2004) (teenage victim's "drug addiction rendered him unusually vulnerable" to defendant's supplying him with cocaine). Neither of those factors obtains here.

In addition, the "focus [should be] not on the likelihood or extent of harm to the individual if the crime is successful, but on the extent of the individual's ability to protect [her]self from the crime." *United States v. O'Neill,* 118 F.3d 65, 75 (2d Cir. 1997); *see also United States v. McCall,* 174 F.3d 47, 50-51 (2d Cir. 1998)(stressing that "[i]t is the

---

[4] In the Plea Agreement, at 4, the government does not seek a two-level "vulnerable victim" enhancement for the sex trafficking of **Jane Doe # 5**; by contrast, the PSR does seek such an enhancement. PSR ¶ 71.

concern over the lack of individualized findings that has given rise to the proposition that age alone is insufficient to support the enhancement" and that victim "must be substantially unable to avoid being a victim of the crime"). Moreover, while the sad fact is that most of the victims in this case were poor, uneducated women from Mexico, that does not render them *unusually* vulnerable. *See United States v. Sabbatino*, 943 F.2d 94, 103 (1st Cir. 1991)("[A]n adjustment for vulnerable victims under U.S.S.G. § 3A1.1 would have been proper only if the young women employed as prostitutes by the [defendants] were 'unusually vulnerable,' that is 'unusually vulnerable' given the kind of victim that is typically involved in a Mann Act violation and that Congress aimed to protect").

In sum, we submit that the Plea Agreement and the PSR err in applying the § 3A1.1 two-level enhancement for the "vulnerability" of Jovan's "victims."

## POINT TWO

### JOVAN SHOULD BE SENTENCED TO A TERM BELOW THE GUIDELINES RANGE

**A.** *Booker* **And Its Progeny**

The Supreme Court held, in *United States v. Booker*, 543 U.S. 220 (2005), that the mandatory nature of the United States Sentencing Guidelines violated the Sixth Amendment. In its remedy opinion, the Court severed 18 U.S.C. § 3553(b)(1), which had rendered the Guidelines binding on federal sentences. This left 18 U.S.C. § 3553(a) in effect. In a series of subsequent decisions, the Supreme Court and the Second Circuit have confirmed that under the advisory Guidelines regime, "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008); *see also Gall v. United States*, 552 U.S. 38 (2007).

Indeed, in *Pepper v. United States*, 562 U.S. 476 (2011), the Court *twice* emphasized that a sentencing judge assumes "an overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Id.* at 491. *See also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[u]nder §3553(a)'s 'parsimony clause,' it is the sentencing court's duty to 'impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth' at 18 U.S.C. §3553(a)(2)")(quoting *United States v. Samas*, 561 F.3d 108, 110 (2d Cir. 2009)).

As our Circuit explained in *Dorvee*,

> [e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a)

> sentencing factors. *See* [*United States v.*] *Cavera*, 550 F.3d [180,]189 [(2d Cir. 2008) (*en banc*)].

604 F.3d at 93.

In short, the foregoing precedents make plain that, post-*Booker*, sentencing courts retain their discretion to depart or vary from the Guidelines. As this Court is undoubtedly aware, certain key principles have emerged: robotic adherence to the Guidelines has been replaced by nuanced, individualized assessment, guided by the factors set out in Section 3553(a). The touchstone is reasonableness, informed by the statutory command that a sentence should not be greater than necessary to achieve its purpose. Finally, and perhaps most critically, the Guidelines are not presumed to be reasonable, and a sentence below the Guidelines range is plainly not defective.

### B. Principal Factors Warranting A Below-Guidelines Sentence

There are a few principal reasons why, we submit, a sentence of 15 years' imprisonment is warranted here. *First*, Jovan, and his co-defendant brothers, endured a very difficult childhood in Mexico. As noted above, Jovan's father was an alcoholic who would physically assault Jovan's mother; the father also physically abused the defendant and his siblings twice per week. Jovan recalled that his father would hit them with a rope, electrical cord or a wooden stick. Jovan stated that they "were often bruised as a result of the abuse." PSR ¶ 114. *See e.g., United States v. Armstrong*, 2008 WL 5459177, at *2 (E.D.N.Y. Dec. 22, 2008)(sentencing defendant to half the Guidelines range, where court observed that "[t]he offense is serious. The defendant was a member of a gang that disturbed the peace and threatened the safety of a public housing project. [But] Armstrong's childhood was affected by inadequate parental control."); *see also United States v. Petit*, 09 CR 455 (JBW), 2010 WL 1727822, at *2 (E.D.N.Y. Apr. 9, 2010)(imposing probation instead of Guidelines range of 27-33 months, where court found that "the offense is a serious one, the defendant is a peaceable, well-motivated young man, who has tried to make the best of a bad childhood. Defendant had abusive parents, and was raised in various foster homes from the age of six").

In addition, as a consequence of very difficult economic circumstances, Jovan was virtually forced to leave school after the sixth grade, because his parents could not afford even meager school-related expenses. After he was 13, Jovan illegally immigrated to the United states on a number of occasions, to be able to hold menial jobs.

*Second*, this Court should also consider Jovan's post-arrest rehabilitation at the MDC, which even in the mandatory-Guidelines era was a valid ground for a departure from the otherwise applicable Guidelines range. *See United States v. Maier*, 975 F.2d 944, 946–48 (2d Cir. 1992); *United States v. Williams*, 65 F.3d 301, 305 (2d Cir. 1995). These decisions recognized that a defendant's "awareness of [his] circumstances and the demonstrated willingness to act to achieve rehabilitation, thereby benefitting the individual and society" could warrant a downward departure. *Maier*, 975 F.2d at 948.

7

Moreover, rehabilitation is highly relevant to several of the factors a sentencing court is required to consider when imposing sentence. *See Pepper*, at 492; *see also* 18 U.S.C. § 3553(a) (listing factors a court must consider when imposing sentence). Post-arrest conduct "constitutes a critical part of the 'history and characteristics' of a defendant that Congress intended sentencing courts to consider." *Pepper*, at 492. quoting § 3553(a)(1)). In addition, this conduct "sheds light on the likelihood that [the defendant] will engage in future criminal conduct, a central factor that district courts must assess when imposing sentence." *Id.; see also* § 3553(a)(2)(B)-(C); *Williams*, 65 F.3d at 308.

Further, a defendant's efforts and attitude toward rehabilitation will necessarily inform the sentencing court's duty to "provide the defendant with needed educational or vocational training ... or other correctional treatment in the most effective manner." § 3553(a)(2)(D). In short, a defendant's post-arrest rehabilitation "bears directly on the District Court's overarching duty to 'impose a sentence sufficient, but not greater than necessary' to serve the purposes of sentencing." *Pepper*, at 493 (quoting § 3553(a)).

In addition, a defendant's efforts and attitude toward rehabilitation will necessarily inform the sentencing court's duty to "provide the defendant with needed educational or vocational training ... or other correctional treatment in the most effective manner." § 3553(a)(2)(D). Finally, a defendant's post-arrest rehabilitation "bears directly on the District Court's overarching duty to 'impose a sentence sufficient, but not greater than necessary' to serve the purposes of sentencing." *Pepper*, at 1243 (quoting § 3553(a)); *see also United States v. Zimmerman*, 10 CR 598 (JG), 2012 WL 3779387, at *7 (E.D.N.Y. June 19, 2012).

Here, there can be little argument that Jovan has been rehabilitated at the MDC, where he has been incarcerated since June 2016. Among others, Jovan has completed the following educational courses: Pre-Trial and Health Education Program. PSR ¶ 119. In addition the PSR states that "[n]o disciplinary history exists for the defendant." *Id.*

*Third*, Jovan is genuinely remorseful about his conduct. He pleaded guilty to Counts One and Fourteen rather than proceed to trial. His action demonstrates acceptance of responsibility and maturity.

RICHARD B. LIND

## CONCLUSION

In sum, for the foregoing reasons, we submit that this Court should impose a sentence of 15 years' imprisonment.

Respectfully submitted,

Richard B. Lind

cc: All Counsel (by ECF)
Probation Officer Patricia A. Sullivan (by email)