TM:ML/BHT
F.#2012R01664

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

       - against -                            Docket No. <u>15-CR-348 (ERK)</u>

JOVAN RENDON-REYES,
       also known as "Jovani,"
SAUL RENDON-REYES,
       also known as "Satanico,"
GUILLERMINA RENDON-REYES,
FRANCISCO RENDON-REYES,
       also known as "Pancho,"
JOSE RENDON-GARCIA,
       also known as "Gusano,"
FELIX ROJAS,
ODILON MARTINEZ-ROJAS,
       also known as "Chino" and "Saul," and
SEVERIANO MARTINEZ-ROJAS,
       also known as "Negro," "Gato" and
       "Arturo,"

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -X


<u>SENTENCING MEMORANDUM</u>


                           RICHARD P. DONOGHUE
                           UNITED STATES ATTORNEY
                           Eastern District of New York
                           271 Cadman Plaza East
                           Brooklyn, New York 11201

Taryn A. Merkl, Assistant U.S. Attorney
Margaret Lee, Assistant U.S. Attorney
Benjamin H. Hawk, DOJ Trial Attorney
      (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND.................................................................................................... 1

   I.     Victims of the Rendon-Reyes Sex Trafficking Organization ................................ 2

      A.   Jane Doe #1 ........................................................................................................ 2

      B.   Jane Doe #2 ........................................................................................................ 4

      C.   Jane Doe #3 ........................................................................................................ 6

      D.   Jane Doe #4 (also referred to as "SAM") and "MSJ"........................................ 7

      E.   Jane Doe #5 ........................................................................................................ 9

      F.   Jane Doe #6 ...................................................................................................... 11

      G.   Jane Doe #7 ...................................................................................................... 14

      H.   Jane Doe #8 ...................................................................................................... 15

      I.   Jane Doe #9 ...................................................................................................... 17

      J.   Jane Doe #10 .................................................................................................... 19

      K.   FBF…................................................................................................................ 20

   II.     The Defendants' Guilty Pleas ................................................................................ 21

APPLICABLE GUIDELINES ................................................................................................ 24

   I.     Applicability of Guidelines §§ 2G1.1(c) and 2G1.3(c) ....................................... 25

   II.     Applicability of Guideline § 3A1.1 ...................................................................... 25

   III.     Alien Smuggling Guidelines.................................................................................. 26

      A.   Unaccompanied Minor, Guideline § 2L1.1(b)(4) .............................................. 27

      B.   Serious Bodily Injury, Guideline § 2L1.1(b)(7)(B) ........................................... 28

      C.   Involuntary Detention, Guideline § 2L1.1(b)(8)(A)........................................... 28

   IV.     Money Laundering Guidelines............................................................................... 29

      A.   Guideline § 2S1.1............................................................................................... 29

B.    Applicability of § 3D1.2 ................................................................ 30

ANALYSIS ................................................................................................ 31

I.    Jovan Rendon-Reyes .................................................................... 32

    A.    Applicable Guidelines ........................................................... 32

    B.    Analysis ................................................................................ 34

II.   Saul Rendon-Reyes ...................................................................... 34

    A.    Applicable Guidelines ........................................................... 34

    B.    Analysis ................................................................................ 36

III.  Guillermina Rendon-Reyes ........................................................... 37

    A.    Applicable Guidelines ........................................................... 37

    B.    Analysis ................................................................................ 38

IV.   Francisco Rendon-Reyes ............................................................. 39

    A.    Applicable Guidelines ........................................................... 39

    B.    Analysis ................................................................................ 40

V.    Jose Rendon-Garcia ..................................................................... 41

    A.    Applicable Guidelines ........................................................... 41

    B.    Analysis ................................................................................ 43

VI.   Felix Rojas .................................................................................. 44

    A.    Applicable Guidelines ........................................................... 44

    B.    Analysis ................................................................................ 46

VII.  Odilon Martinez-Rojas .................................................................. 48

    A.    Applicable Guidelines ........................................................... 48

    B.    Analysis ................................................................................ 51

VIII. Severiano Martinez-Rojas ............................................................. 53

    A.    Applicable Guidelines ........................................................... 53

B.  Analysis ................................................................................................ 56

RESTITUTION ............................................................................................................ 57

I.      Jane Doe #1: $184,800 ............................................................... 60

II.     Jane Doe #2: $67,200 ................................................................. 61

III.    Jane Doe #3: $33,600 ................................................................. 61

IV.     Jane Doe #4 (SAM): $25,000 .................................................... 61

V.      Jane Doe #5: $88,200 ................................................................. 62

VI.     Jane Doe #6: $117,600 ............................................................... 62

VII.    Jane Doe #7: $58,800 ................................................................. 62

VIII.   Jane Doe #8: $239,400 ............................................................... 62

IX.     Jane Doe #9: $214,200 ............................................................... 62

X.      FBF, MSJ and SAM (Jane Doe #4): $190,000 .................................. 63

CONCLUSION............................................................................................................ 64

PRELIMINARY STATEMENT

The government respectfully submits this brief in advance of the sentencings in this case, which are scheduled for December 12 and December 13, 2018. On these dates, the Court is scheduled to sentence defendants Jovan Rendon-Reyes, Saul Rendon-Reyes, Guillermina Rendon-Reyes, Francisco Rendon-Reyes, Jose Rendon-Garcia, Felix Rojas, Odilon Martinez-Rojas and Severiano Martinez-Rojas.

FACTUAL BACKGROUND

As detailed in the PSRs, the defendants in this case, who were members of the Rendon-Reyes Trafficking Organization ("the Organization"), smuggled young, poor and uneducated women and minor girls from Mexico into the United States and forced them to engage in prostitution for the defendants' profit in New York, Georgia and throughout the United States. See, e.g., Jovan Rendon-Reyes Pre-Sentence Investigation Report ("J. Rendon-Reyes PSR") ¶¶ 6-12.[1]  The trafficking conduct underlying the offenses of conviction involved twelve victims, Jane Does #1 through #10 and "FBF" and "MSJ."[2]

The defendants, and other members of the Organization, were all family members from Mexico who typically used false promises of love and support to lure young Mexican and Latin American women and girls into fraudulent romantic relationships. See, e.g., J. Rendon-Reyes PSR ¶ 8.  Once the defendants separated the victims from their families, they pressured the victims to enter the United States unlawfully, in most cases,

---

[1] For expediency, in discussing the background facts and offense conduct, this memorandum frequently cites to the PSR for Jovan Rendon-Reyes, the first-listed defendant on the indictment, rather than the PSRs for all eight defendants, as the offense conduct is similarly described in the individual defendants' PSRs.

[2] Jane Doe #4 is also referred to as "SAM" in the PSR.

1

unaware that the defendants intended for them to engage in prostitution.  The defendants then utilized different methods to force the women and girls to engage in prostitution, including beatings, sexual assaults, forced abortions, threats to the victims, their families and children, and psychological coercion.  The defendants also took all, or nearly all, of the victims' prostitution proceeds and funneled the money back to other members of the Organization in Mexico.  See, e.g., id. at ¶¶ 8-11.

I.      Victims of the Rendon-Reyes Sex Trafficking Organization

   A.      Jane Doe #1

           Had the case gone to trial, Jane Doe #1 would have testified, in sum and substance, that she met defendant Odilon Martinez-Rojas in 2003 or 2004, while she was working at a store in Mexico.  At that time, she was 19 years old and had three children between the ages of one and three.  She was trying to earn money for her sick children, who needed medical treatment.  Odilon visited and contacted her often, convincing her that she could work at his family restaurant in Tenancingo to lure her there.[3]  He promised her that she could earn twice as much while working less time.  When she arrived in Tenancingo, no such job existed, and Odilon offered to bring her to the United States where he claimed she could earn more money cleaning houses.  She agreed to go, thinking that it would help her children.

           Approximately one month later, Odilon departed for the United States.  He told Jane Doe #1 that his brother, defendant Severiano Martinez-Rojas, would bring her to the United States.  After reaching the United States, however, Odilon called and told her that

---

[3] Given the defendants' similar last names, this memorandum at times also refers to the defendants by their first names for simplicity.

she was going to cross the border with a different man and two other women.  Severiano

arranged the logistics for the trip, instructing Jane Doe #1 when it was time to leave, driving

her and the other individuals to the airport, and providing everyone with airline tickets.  The

group flew to Sonora, Mexico and then ultimately crossed the border into the United States

on foot.  Once across the border, they flew to Atlanta, where Odilon picked them up.

As soon as Jane Doe #1 arrived in Atlanta, Odilon and three other women took

Jane Doe #1 to a flea market to purchase clothes.  The women told Jane Doe #1 that she

would be working at a bar serving drinks on the weekend.  When they returned to the house,

Odilon gave her instructions on what to wear.  While she was getting dressed, Odilon entered

her room, grabbed her and raped her.  Odilon then sent Jane Doe #1 with another man, who

was going to drive her to work.  The man then discovered that Jane Doe #1 did not know

what she was supposed to do (i.e., engage in prostitution).  He put Jane Doe #1 on the phone

with Odilon, who told Jane Doe #1 that she had to work in prostitution, and charge men $30

for sex for fifteen minutes.  Jane Doe #1 refused and the driver took her home.  As soon as

she entered the house, Odilon grabbed her arm and punched her in the face.  He threatened to

harm her family if she refused again.  He continued to beat her with a cord from an iron until

he was too tired.  Jane Doe #1 told Odilon that she would prostitute for him if he stopped

hitting her.

Jane Doe #1 began engaging in prostitution almost every day, seeing upwards

of 20 to 45 clients per day.  Odilon would organize the drivers, who would transport her to

customers, and provide her with condoms each day.  When she returned from work, Odilon

would count her remaining condoms and compare it to the amount of money that she had

earned.  For the next approximately two years, Odilon forced her to prostitute.  Jane Doe #1

was sent out of Georgia to locations in South Carolina, North Carolina, Maryland, the District of Columbia, Delaware, Pennsylvania, New Jersey, Alabama and New York to prostitute. Defendant Jovan Rendon-Reyes also helped to prostitute her in Atlanta, New York, New Jersey and Delaware. During the time that she was forced to work for him, Odilon continued to beat Jane Doe #1. On one occasion, he hit her in the back with a baseball bat. After two more assaults, Jane Doe #1 decided to try and escape, running away and hiding with the help of a woman that she had met in the prostitution business.

Approximately two years later, Jane Doe #1 was with her new baby and saw Odilon in a restaurant. Odilon threatened her and her baby if she did not start prostituting for him again, telling her that she owed him $50,000 in lost proceeds. She acquiesced out of fear and began working in prostitution for Odilon again. During this second period working for Odilon, Odilon sent Jane Doe #1 to prostitute at a brothel-trailer in Alabama operated by defendant Severiano Martinez-Rojas. Severiano raped her while she was working there. Odilon also sent her to work at a brothel-trailer in Alabama operated by defendant Saul Rendon-Reyes, where Saul forced her to have sex with him by depriving her of food. In late 2011, Jane Doe #1 left Odilon for good, believing that she had fully repaid her debt. A victim statement prepared by Jane Doe #1 and an English translation of that statement are attached hereto as Exhibit A.

B.     Jane Doe #2

Had the case gone to trial, Jane Doe #2 would have testified, in sum and substance, that she met defendant Saul Rendon-Reyes in early 2006. He invited her to his home in Tenancingo, where he falsely convinced her that he loved her. Saul then persuaded her to travel with him to the United States and brought her to a house in New York, where

4

she lived with defendants Guillermina Rendon-Reyes and Francisco Rendon-Reyes and others.  Upon arrival, Saul told her that she had to engage in prostitution to repay their smuggling fees.  When she refused, he denied her food, feminine hygiene products and clothing.  As a result, she bled on her only clothes, which she had to wash in the sink and put back on wet and cold.  Francisco also refused to give her any money, feminine hygiene products or clothing.  Saul told Jane Doe #2 that if she worked, there would be food.  Because of her hunger and situation, she had no option but to start prostituting for Saul.

Initially, Francisco and Saul called numbers for drivers to take her to work, but she was later provided with a telephone for that purpose.  Guillermina provided Jane Doe #2 with instructions about what she would have to do with the clients, including specific instructions about removing her clothes.  Francisco and Saul also provided her with condoms, and Francisco explained to Jane Doe #2 that she should unwrap the condoms in advance and store them all in one condom, which she would hide on her person.  The first night that Jane Doe #2 worked in prostitution, she saw approximately eight clients and then could not continue.  When she got back, Saul told her to work harder and earn more.  After two more days of work, Saul still did not think she was earning enough, and got upset and told her that she owed him money for smuggling fees, rent and food.  If Jane Doe #2 did not work, Saul would not allow her to eat.  Saul would also hit her if she refused to work.

While she was working, Jane Doe #2 got pregnant.  During the pregnancy, Saul did not provide her with enough to eat and kept her malnourished.  Approximately forty days after giving birth, Saul forced Jane Doe #2 to return to work.  After she had returned to work, she came home late one night and Saul severely beat her.  Saul slammed her head into

the wall, punched her and continued punching her even after she fell to the floor.  After this

incident, Jane Doe #2 decided to escape, which she was able to successfully do.

      C.    <u>Jane Doe #3</u>

      Had the case gone to trial, Jane Doe #3 would have testified, in sum and

substance, that the she met defendant Jose Rendon-Garcia in March 2006, when she was only

14 years old.  He started romancing her and then forced her to have sex with him.  She had

never had sex before, and she was ashamed to return home because she had sex out of

wedlock.  Jose told her that she would be staying with him, and he would tell her family.

Jane Doe #3 did not think she had any say in the matter.  Jose convinced her that he loved

her, that they would get married and that they would build a house together.  On one

occasion, she tried to leave him, but he punched her and locked her in a room.  Eventually, in

June 2006, he told Jane Doe #3 that they were going to go to the United States because his

cousin could find him a job and he could earn more money.  In June, Jose smuggled Jane

Doe #3 into the United States after obtaining a fraudulent birth certificate for her, indicating

that she was an adult.  They made multiple attempts to cross before they were successful.

Defendant Guillermina Rendon-Reyes went with them, and, when law enforcement tried to

question Jane Doe #3 after the group was detained while crossing the border, Guillermina

said that she was Jane Doe #3's aunt and in charge of her.

      Once they successfully crossed the border, Guillermina and her husband went

to New York, and Jose and Jane Doe #3 went to Georgia.  Once they arrived in Georgia,

defendant Felix Rojas met them and brought them to his apartment.  About a week later, Jose

told Jane Doe #3 that she had to engage in prostitution and threatened her family if she

refused.  The first day she worked, she saw 20 customers.  She then started working every

6

day except when she was menstruating.  If she did not earn at least $300 a day, Jose would

beat her with his hands and a belt.  She gave all of her money to Jose, who told her that he

was using the money to pay back the loans that Felix and others had taken out to pay their

smuggling fees.  She was also sent to Alabama to work at defendant Severiano Martinez-

Rojas's brothel-trailer for a week.  Men would come to the trailer, have sex with her, and

then pay the money directly to Severiano.  Jose forced her to prostitute for approximately

five months until she managed to escape when she was 15 years old.

D.     Jane Doe #4 (also referred to as "SAM") and "MSJ"

Had the case gone to trial, Jane Doe #4 and MSJ would have testified, in sum

and substance, that she and her friend MSJ, who was a virgin at the time, were introduced to

Odilon Martinez-Rojas and his nephew, Arturo Rojas-Coyotl, while living in Guatemala

around March 2007.[4]  At the time, Jane Doe #4 and MSJ were no longer attending school in

order to help support their families.  Odilon convinced Jane Doe #4 that he was her boyfriend

and that he could help her and MSJ find jobs in the United States.  Odilon and Arturo never

mentioned prostitution, and Jane Doe #4 and MSJ would not have traveled to the United

States had they known.

Around October 2007, Odilon, Arturo and others helped smuggle Jane Doe #4

and MSJ into the United States through Mexico.  While attempting to enter Mexico from

_____

[4] Defendant Arturo Rojas-Coyotl was convicted in a related case in the Northern District of Georgia of sex trafficking SAM ("Jane Doe #4"), MSJ and FBF and sentenced to 192 months in prison.  NDGA Docket No. 13-CR-128.  He is not a named defendant in this case.  Defendant Odilon Martinez-Rojas also was convicted of those charges and sentenced to 262 months in prison.  Following a Rule 20 transfer of the Northern District of Georgia case as to defendant Severiano Martinez-Rojas, he pled guilty in EDNY to one count of the Northern District of Georgia indictment, and additional conduct as part of this case.

Guatemala, Jane Doe #4 and MSJ were apprehended and sent back to Guatemala.  On their second attempt, they were brought to Tenancingo, where Jose Rendon-Garcia obtained fraudulent Mexican birth certificates for them so that they could remain in Mexico if caught again.  Odilon, Arturo and others then helped smuggle Jane Doe #4 and MSJ into the United States.  Along the way to Georgia, MSJ became sick, learning later that she had gallstones. She felt uncomfortable and scared, but Arturo assured her that he loved her and not to be afraid.

After arriving in Georgia, Odilon told Jane Doe #4 that the job she had been promised did not work out and there was no money to provide food for her or MSJ.  He further told her that she and MSJ owed them $14,000 for bringing them to the United States. Owing a large amount of money, with few options, and afraid that Odilon and Arturo would force her friend MSJ to prostitute, Jane Doe #4 reluctantly agreed to engage in prostitution if they promised to leave MSJ alone.  Jane Doe #4 knew MSJ was a virgin and that fact contributed to her decision to try to protect her friend.  On her first night, she had sex with seven men, and Odilon took all of the money.  Over time, she would give him as much as $3,000 in prostitution proceeds a week.

Despite Jane Doe #4's attempt to protect her friend MSJ, Arturo forced MSJ to prostitute also, shortly after they arrived in Georgia, and he took her virginity.  The first week he made her work, she had sex with upwards of 40 men.  She was expected to earn $3,000 a week or more.  As a result of being required to prostitute, MSJ developed a significant vaginal injury that caused her extreme pain.  On one occasion, Arturo brought MSJ to defendant Severiano Martinez-Rojas's brothel-trailer in Alabama to prostitute. Severiano attempted to have sex with her, telling her that she did not know how to prostitute

because Arturo never taught her how to have sex.  After two days, Severiano told Arturo to pick up MSJ because she was not making him enough money.  Jane Doe #4 was also forced to prostitute at Severiano's brothel-trailer in Alabama on separate occasions.

In January 2008, Jane Doe #4 learned that MSJ was being forced to prostitute. Jane Doe #4 saw that MSJ was sick, throwing up, and complained of a severe rash that bled. She was upset and confronted Odilon and Arturo.  Odilon became enraged.  When Jane Doe #4 said that they were leaving, Odilon grabbed her hair and threw her on the bed.  She tried to fight back, but he punched her in the stomach, causing her to curl up in the fetal position and start crying.  Odilon told her that she would never leave.  On another occasion, Arturo hit MSJ in the face in front of Jane Doe #4 when he thought that she was leaving.

Shortly after, Jane Doe #4 and MSJ started planning MSJ's escape.  MSJ managed to call a family member in the United States without Odilon or Arturo's knowledge.  The family member arranged for someone to pick up MSJ, and she left.  After MSJ's escape, Odilon and Arturo were afraid that the police would start investigating their activities.  Arturo fled back to Mexico, while Odilon paid a "visit" to Jane Doe #4's family in Guatemala to make sure she was aware that he knew where she lived.  It was at that time, around May 2008, that Jane Doe #4 also gained the courage to escape.  Victim statements prepared by Jane Doe #4 and MSJ and English translations of those statements are attached hereto as Exhibit B and C, respectively.

E.      Jane Doe #5

Had the case gone to trial, Jane Doe #5 would have testified, in sum and substance, that she met defendant Jovan Rendon-Reyes in 2007, when she was only 16 years old.  Jovan, who was with defendant Felix Rojas, approached Jane Doe #5 and her friend at a

9

market.  He then aggressively tried to romance her, eventually getting her to agree to go to a

swimming pool with him.  Instead of taking her to the pool, he kidnapped her by driving her

across Mexico to his home in Tenancingo, where he forced her to have sex.  After she found

a phone and tried to call her family, Jovan hit her.  He then told her he had no money but had

found a job for her prostituting.  When she refused, he threatened her and told her the only

way to see her family again was to prostitute.  Jovan also threatened to hit her if she did not

work.

      For approximately six months, Jovan forced her to prostitute in Mexico.  Jovan

then told Jane Doe #5 that they, along with Felix and Jane Doe #6, whom Felix had been

forcing to prostitute in Mexico, were going to New York.  In January 2008, when Jane Doe

#5 was still only 17 years old, she left for the United States with Felix, Jane Doe #6 and a

few others.  After they crossed the border, the smuggler called defendant Guillermina

Rendon-Reyes, who then paid the remainder of the smuggling fees.  Jane Doe #5 was picked

up by defendant Odilon Martinez-Rojas and taken to Atlanta.

      Approximately one week later, Guillermina arrived from New York to pick up

Jane Doe #5.  Guillermina and Jane Doe #5 took the bus to Queens, New York.  Defendant

Saul Rendon-Reyes and one of Guillermina's sons met them at the bus station and took them

to their house in Queens.   Defendant Francisco Rendon-Reyes and Jane Doe #10 were also

living in the house.  Jane Doe #5 had lived with them in Mexico before they had come to the

United States.  Guillermina gave Jane Doe #5 $100 to go shopping and told Jane Doe #10 to

contact drivers to take Jane Doe #5 to work.

      The first night, Jane Doe #5 saw 25 customers.  When she returned to the

house, Guillermina told her to send the money she had made to Jovan, who was still in

Mexico.  She was told that she needed to send him $6,000 in the next two months to pay for his smuggling fees.  Guillermina told Jane Doe #5 that Jovan would be very upset if she did not earn enough money, and that Jovan had beaten a woman in the past for not earning enough money.

Jovan arrived in the United States in March 2008.  After he arrived, he sent for Jane Doe #5, and she took a bus to Atlanta.  Jane Doe #5 worked every day, except one day when Jovan beat her very badly because of a rumor that she had a lover in Mexico.  After about a month in Atlanta, they returned to New York and the house in Queens.  Jane Doe #5 was forced to continue prostituting.

On April 24, 2008, she was arrested but did not tell the police anything because Jovan had warned her that the police would not believe her because she was illegal and had no proof.  Jovan then took her back to Atlanta to work.  On one occasion, she and the individual driving her were robbed.  When Jovan found out, he kicked her.  Jovan later sent her to work at a brothel-trailer operated by defendant Jose Rendon-Garcia.  The first day, she only had ten customers, so Jovan said he was coming to the trailer to beat her.  The police then raided the trailer and arrested Jane Doe #5.  Jovan, who was on his way to the trailer, was also arrested.  Jovan and Jane Doe #5 were both deported to Mexico.  Back in Mexico, Jovan continued to force Jane Doe #5 to work.  In 2014, Jane Doe #5 was finally able to escape.

F.     Jane Doe #6

Had the case gone to trial, Jane Doe #6 would have testified, in sum and substance, that she first met defendants Felix Rojas and Jose Rendon-Garcia in Mexico in 2007.  Felix invited Jane Doe #6 and her infant son to a fair, together with a friend of Jane

Doe #6's.  After she got into Felix's car, he locked the car doors, kidnapping her, and drove her and her son to a house in Tenancingo, where he took away her phone.  En route, Felix told Jane Doe #6 that she was "fucked," and that she belonged to him now.  He also told her to tell her parents that they were in a relationship and threatened to hurt her son if she refused or tried to escape.

Felix then left Jane Doe #6 at the house, which appeared to be occupied by one of Felix's relatives, where she was put in a cold room that contained a bed and no blanket. He left her there for two weeks.  Jane Doe #6 was provided with one meal per day, which she shared with her son.  She also breastfed her son to keep him nourished.  Felix then returned and took her to another house, which belonged to defendant Jovan Rendon-Reyes.

Felix ultimately let Jane Doe #6 return to her family, but she was directed to tell them that she was now with Felix.  She then returned to Felix, who told her that he would be back to pick her up for work.  Felix had told her that he was a corn farmer, so she thought that she was going to be forced to work in the cornfields.  When Felix returned, he took Jane Doe #6's son to the house of Jovan's mother, and then took Jane Doe #6 to a hotel, where he raped her.  The next morning, Jane Doe #6 was told that she was going to be prostituting. Jane Doe #6 tried to protest, but she ultimately relented and saw eight clients her first night. When Jane Doe #6 would refuse to work, Felix "reminded" her that he had her son, which she understood to be a threat, knowing that her son was with Jovan's mother.  She was forced to prostitute in Mexico until January 2008, when he smuggled her into the United States.

As previously discussed, in January 2008, Jane Doe #6, Felix, Jane Doe #5 and a few others, including Jane Doe #7, crossed the border into the United States.

Defendant Severiano Martinez-Rojas picked up Felix and Jane Doe #6.  Felix told Jane Doe #6 that some of the girls that had come across were going with Severiano to Alabama and others were going to Atlanta.  The entire group went to Alabama and then to Atlanta.  Felix and Jane Doe #6 then took a bus to New York, where Felix tried to pick up another girl, before returning to Atlanta.  Felix then took Jane Doe #6 to buy clothes and gave her a cellphone to use for work.

Felix told Jane Doe #6 that she had to earn between $3,000 and $4,000 a week if she ever wanted to speak with her son again.  Felix forced Jane Doe #6 to work from 6:00 p.m. to 1:00 a.m. every day, unless she was told to stay home and cook or clean for him.  On her first night, she had sex with 20 men, and during the first week, she earned $2,000.  Felix did not think she was earning enough, so he sent her to North Carolina to work for a week.  Jane Doe #6 also worked at a brothel-trailer in Atlanta operated by defendant Odilon Martinez-Rojas.  Throughout the time she was working, Felix made her continue prostituting even if she was menstruating, showing her how to use sponges to stop the bleeding.  Felix sent Jane Doe #6 to work in Tennessee, South Carolina, Alabama, Mississippi, Florida, Louisiana and Texas.  She also was sent to work at defendant Severiano Martinez-Rojas's brothel-trailer in Alabama.

In August 2008, Felix took Jane Doe #6 back to New York.  They stayed at the house in Queens with defendant Guillermina Rendon-Reyes, Jane Doe #10 and defendant Francisco Rendon-Reyes.  Francisco provided Felix with a book of prostitution drivers so that Jane Doe #6 could work.  Jane Doe #6 worked in Port Chester, Westchester and Long Island.  While they were in New York, Felix tried to have sex with Jane Doe #6 one night but

she refused.  Felix put a cigarette out on her and then pushed her on a bed and started beating her.

A few months later, Jane Doe #6 told Felix that she was pregnant.  Felix tried to give her pills to induce an abortion, and then he began to beat her stomach to induce labor. Jane Doe #6 then went to the bathroom in tremendous pain, where she had a miscarriage and then lost consciousness.  Soon after, Felix returned to Mexico, but Felix told Jane Doe #6 that she had to continue working if she ever wanted to see her son again.  Felix would call her and put her son on the telephone while he was crying and then tell her that was why she needed to send money.  In 2010, Jane Doe #6 sent money to Felix for the last time and stopped working for him.  She was able to get her son from his family to her mother's house in Mexico.

G.     Jane Doe #7

Had the case gone to trial, Jane Doe #7 would have testified, in sum and substance, that she first met defendant Severiano Martinez-Rojas in Mexico in 2006. Severiano recruited her over the phone while she was in Mexico, and he was in the United States.  Severiano talked to her about starting a relationship, told her that he was a mechanic, and asked her to come to the United States to be his girlfriend.  He told her that she could live with him, and they could start a family together.  She eventually agreed, and he arranged for her to travel to be with him in the United States.  Defendant Felix Rojas picked her up, and he took her with a group of people, including Jane Doe #6, across the border.  After they crossed the border, defendant Odilon Martinez-Rojas arrived and took her along with some of the others to Atlanta.  Once she arrived, Severiano lied that he had lost his job and needed money to pay her smuggling fee and overdue rent.  He then told her that she had to prostitute.

When she refused, he screamed at her and trapped her in his apartment, isolating her from friends and family. He continued to pressure her to prostitute, until she became too afraid to say no. He forced her to prostitute, including at his brothel-trailer in Alabama, and he beat her and threatened to beat her when she refused to work or tried to leave. Jane Doe #4 (also referred to as "SAM") gave Jane Doe #7 the courage to leave and helped her escape.

H.   Jane Doe #8

Had the case gone to trial, Jane Doe #8 would have testified, in sum and substance, that she first met defendants Felix Rojas and Jovan Rendon-Reyes in Puebla, Mexico in 2009. She met Felix at a fair in Mexico, and he then started to pursue her. He eventually invited her to his home in Tenancingo to show her that he was serious about being with her. She agreed, and they began a romantic relationship.

Felix asked Jane Doe #8 to move in with him and his family, and she agreed. Jane Doe #8 then became pregnant. When she told Felix, he became very angry and forced her to have an abortion. While they were still living in Mexico, Felix and Jane Doe #8 attended a family party. Felix became jealous of someone Jane Doe #8 was talking to, and he took her upstairs, hit her and then kicked her as she lay on the ground. After approximately a year together, Jane Doe #8 became pregnant again. Felix did not get angry this time but instead asked if she wanted to go to the United States to have the baby. Felix told her that the baby would have a better future there, and they could both work, save money and then return to Mexico. She agreed to go to the United States.

Felix told Jane Doe #8 that there was only enough money to pay for her trip, but she would live with his nephew, defendant Jose Rendon-Garcia, in Atlanta and earn money to pay for Felix's trip. Felix and Jose arranged for her trip, and, in June 2010, Jane

Doe #8 attempted to cross the border but was apprehended by Border Patrol and released.

Jane Doe #8 did not want to try to cross the border again, but Felix insisted.  Jane Doe #8

crossed the border on her own, and Jose picked her up in Houston and drove her to Atlanta.

Approximately two weeks later, Felix told Jane Doe #8 on the phone that she had to

prostitute.  Jane Doe #8 felt stranded because she did not know anyone, could not contact her

family and was pregnant.  She asked Felix's family if she could work in a restaurant, but Jose

and the other men she was living with told her that she could not get any job without legal

papers, so she had to prostitute.  Jose told her that she had no other options and nowhere to

go.  Jane Doe #8 felt that she had no choice because she needed to eat and have a place to

live for her baby.  Felix and Jose also told her that she needed to prostitute to repay her

smuggling fees.

Jane Doe #8 started engaging in prostitution every day for two months, even

though she was visibly pregnant.  She saw approximately 15 customers every night.  Jose

taught Jane Doe #8 how to wire money to Felix in Mexico.  Jose told her to send the wires in

the name of Felix's sister because it would raise red flags for the authorities if Felix collected

too much money.  Jane Doe #8 stopped working when she was six months pregnant.  In

January 2011, Jane Doe #8 gave birth, and two days later Felix arrived in Atlanta.  Forty

days after giving birth, Jane Doe #8 was forced to go back to work so she could afford to buy

food and milk.  She told Felix that she not want to prostitute, but he told her that there was no

other way because she did not have any papers.

Jane Doe #8 continued working and giving all of the money to Felix.  She

thought that the money was being used to pay her smuggling fees and build the house that he

had told her they would build together.  Felix would take her to buy condoms, and he would

count the number before she worked each night and when she returned.  He continued to beat her whenever she talked back to him.  He also sent their daughter to Mexico, as a means of control.  On one occasion, when she wanted to leave, he slapped her, threw her to the floor and kicked her in the ribs.  She continued to prostitute in Georgia, North Carolina, South Carolina, Mississippi and Alabama.  In May 2013, defendant Odilon Martinez-Rojas, Arturo Rojas-Coyotl, and others were arrested in Atlanta as part of the Northern District of Georgia case, which created fear within the Organization.  Jane Doe #8 took the opportunity to get her daughter back and escape.

      I.    <u>Jane Doe #9</u>

      Had the case gone to trial, Jane Doe #9 would have testified, in sum and substance, that she first met defendant Odilon Martinez-Rojas in Mexico in 2010.  Odilon romantically pursued Jane Doe #9, eventually convincing her that he loved her.  Jane Doe #9 moved in with Odilon.  In October 2010, he told her that he was going to send her to the United States.  Although Jane Doe #9 did not want to go, she ultimately agreed because she was in love with him and thought they were going to build their lives together in the United States.  Odilon made all of the arrangements for her trip.  After she made it across the border to Texas, one of Odilon's family members picked her up and took her to Atlanta.

      Soon after she arrived, one of the women she was living with, "Adriana," took her to Walmart to purchase condoms.  Adriana told Jane Doe #9 that this is what she was going to be doing, later explaining that Jane Doe #9 would be engaging in prostitution.  Jane Doe #9 called Odilon, who also told her that she would be prostituting because she was illegal and could not find any other job in the U.S.  Jane Doe #9 had never been in the U.S., did not speak English and did not have any family or friends in the U.S.  She felt like she had

17

no other choice.  On the first occasion, she refused, hid in a room and cried uncontrollably.

Jane Doe #9 then acquiesced and started working every day in prostitution.  She sent Odilon

approximately $800 to $1,000 a week.  Odilon verbally abused Jane Doe #9 on the phone if

he felt that she had not sent enough money.

   In January 2011, Odilon arrived in Atlanta.  Odilon sent her to work every day

without any days off.  Jane Doe #9 came home from work to find Odilon in Adriana's bed,

and Odilon told her that Adriana was his woman.  Jane Doe #9 became very upset, locked

herself in her room and then tried to leave to visit a friend.  Odilon blocked her from leaving,

took her phone, and when he returned it the next day he had wiped all of her contacts and

given her a new phone number.  Now that Odilon was in the U.S., Jane Doe #9 gave all of

her earnings directly to him.

   Two weeks after he had arrived, he sent Jane Doe #9 to South Carolina to

work.  While she was gone, Odilon was arrested for drunk driving.  Even while he was in

jail, Odilon would tell Jane Doe #9 not to run away and that there was nowhere that she

could go where he would not be able to find her.  Odilon was subsequently deported, but he

returned in July 2011.  Jane Doe #9 told Odilon that she no longer wanted to work.  Odilon

slapped her until Adriana intervened.

   Jane Doe #9 later became pregnant, and Odilon forced her to take pills to

cause an abortion.  She continued to bleed for forty days.  When she refused to work because

of the bleeding, Odilon forced her to show him the bleeding.  He would monitor her sanitary

napkins and told her that if the flow was less, then she should be back at work.  During this

time, Odilon became so angry with her that on one occasion, he dragged her by her hair

around the apartment and then threw her down, stepped on her face and broke her nose.  He

kept hitting her in the face, even as she was bleeding.  While Odilon was in the U.S., Jane

Doe #9 worked in Mississippi, Louisiana, Alabama, South Carolina, Florida and Tennessee.

In May 2013, Jane Doe #9 was taken into custody with Odilon and Adriana in

their apartment.  Jane Doe #9 was placed in a shelter with Adriana.  Severiano Martinez-

Rojas went to visit Jane Doe #9's mother in Mexico and told her that it was important her

daughter speak to him.  Jane Doe #9 and Adriana called him, and Adriana told him that Jane

Doe #9 was cooperating with law enforcement and that it was all her fault.  Severiano spoke

to Jane Doe #9 three more times and on each occasion, he threatened her, telling her that she

knows what is going to happen to her if she goes to the police.  Jane Doe #9 eventually left

the shelter and stopped cooperating with law enforcement.  She continued working in

prostitution and sending money to Odilon.  Odilon and Severiano would provide her with the

names of the individuals to whom she should send money.  Odilon told her that if she did not

send money one day, they would find her and hurt her.  Eventually, Jane Doe #9 stopped

sending them money, and Severiano told her that she better hope they never see her again.  A

victim statement prepared by Jane Doe #9 and an English translation of that statement are

attached hereto as Exhibit D.

J.      Jane Doe #10

At trial, the evidence would have shown that Jane Doe #10 was brought to the

United States as an adult by defendant Francisco Rendon-Reyes.  See, e.g., J. Rendon-Reyes

PSR at ¶¶ 30-32.  After attempting to cross the border two times with Jane Doe #10 and other

females, defendant Francisco Rendon-Reyes was able to successfully smuggle Jane Doe #10

into the United States.  Once in the United States, Jane Doe #10 worked in prostitution, and

sent money to Francisco's mother and to defendant Guillermina Rendon-Reyes.

K.     FBF

Had this case gone to trial, FBF would have testified, in sum and substance, that Arturo Rojas-Coyotl forced her to prostitute with help from his uncles, defendants Odilon Martinez-Rojas and Severiano Martinez-Rojas, who were much older and more experienced sex traffickers than Arturo.  FBF is from a poor family who lived in a small village in the mountains in Mexico.  She dropped out of school at age 12 to help support her family.

Around February 2006, Arturo met FBF at a dance in Mexico City and romantically pursued her.  He convinced her that he loved her and brought her to his home in Tenancingo to meet his family.  He eventually raised the idea of going to the United States and told FBF that she could make a lot of money working there.  He never mentioned prostitution, and FBF would not have traveled had she known what was in store for her.  In April 2006, Arturo attempted to smuggle FBF into the United States.  FBF made it across the border, but authorities apprehended Arturo.  FBF was then brought to Odilon and Severiano's house in Georgia.  The very first night, FBF was forced to prostitute under Odilon and Severiano's supervision.  She was told that she owed a debt, and Severiano took her identification documents.  He also collected the proceeds.  After about a week, Arturo arrived, and Odilon and Severiano instructed him to cut FBF's face and beat her if she refused to work.

Over the next year and a half, FBF was forced to prostitute.  Arturo threatened FBF, beat her, and made her feel worthless.  Odilon and Severiano threatened her and intimidated her, and Odilon raped her on two occasions.  FBF also witnessed Odilon beat another woman.  All of this conduct made FBF fearful of them.  During this time, Odilon and

Severiano continued to help Arturo prostitute FBF and collected her proceeds for him.  FBF was also forced to prostitute at Severiano's brothel-trailer in Alabama.

During the summer of 2007, FBF started planning to run away.  It was around this time that she overheard Arturo and Odilon talking about recruiting a couple of women from Guatemala — later identified as MSJ and Jane Doe #4 ("SAM").  Arturo told FBF that the Guatemalan women did not know they would be involved in prostitution, so he wanted FBF to move out so they could pretend to be their boyfriends.  Around November 2007, he drove FBF to a brothel in Alabama and then returned to the Atlanta area.  FBF thereafter left the defendants after finding the courage to do so with the help of a customer.  A victim statement prepared by FBF and an English translation of that statement are attached hereto as Exhibit E.

## II.    The Defendants' Guilty Pleas

In April 2017, defendants Jovan Rendon-Reyes, Saul Rendon-Reyes, Guillermina Rendon-Reyes, Francisco Rendon-Reyes, Jose Rendon-Garcia, Felix Rojas, Odilon Martinez-Rojas and Severiano Martinez-Rojas pled guilty, variously, to racketeering and sex trafficking charges before the Honorable Vera M. Scanlon, United States Magistrate Judge.  Severiano Martinez-Rojas also pled guilty to sex trafficking charges that were transferred from the Northern of District of Georgia ("NDGA Indictment") pursuant to Rule 20 of the Federal Rules of Procedure.  Specifically, the defendants pled guilty to the following counts:

| Defendant | Charges | Victims |
|---|---|---|
| Jovan Rendon-Reyes | - Racketeering in or about and between December 2004 and November 2015, in violation of 18 U.S.C. § 1962(c) (Count One) | Jane Does #1, 5 & 6 (Count One) |
|  | - Sex trafficking by force, fraud or coercion of Jane Doe #5, in or about and between June 2007 and February 2009, in violation of 18 U.S.C. § 1591(a)(1) & (b)(1) (Count Fourteen) | Jane Doe #5 (Count Fourteen) |
| Saul Rendon-Reyes | - Racketeering in or about and between December 2004 and November 2015, in violation of 18 U.S.C. § 1962(c) (Count One) | Jane Does #2 and 7 (Count One) |
|  | - Sex trafficking by force, fraud or coercion of Jane Doe #2, in or about and between January 2006 and April 2007, in violation of 18 U.S.C. § 1591(a)(1) & (b)(1) (Count Nine) | Jane Doe #2 (Count Nine) |
| Guillermina Rendon-Reyes | - Racketeering in or about and between December 2004 and November 2015, in violation of 18 U.S.C. § 1962(c) (Count One) | Jane Does #3 and 5 (Count One) |
| Francisco Rendon-Reyes | - Racketeering in or about and between December 2004 and November 2015, in violation of 18 U.S.C. § 1962(c) (Count One) | Jane Does #2 and 10 (Count One) |
|  | - Interstate Prostitution of Jane Doe #10, in or about and between August 2007 and October 2013, in violation of 18 U.S.C. § 2422 | Jane Doe #10 (Count Twenty-Six) |
| Jose Rendon-Garcia | - Racketeering in or about and between December 2004 and November 2015, in violation of 18 U.S.C. § 1962(c) (Count One) | Jane Does #3 and 8 (Count One) |
|  | - Sex trafficking of minor Jane Doe #3, in or about and between March 2006 and October 2006, in violation of 18 U.S.C. § 1591(a)(1) & (b)(2) (Count Eleven) | Jane Doe #3 (Count Eleven) |
| Felix Rojas | - Racketeering in or about and between December 2004 and November 2015, in violation of 18 U.S.C. § 1962(c) (Count One) | Jane Does #6 and 8 (Count One) |

| Defendant | Charges | Victims |
|---|---|---|
| | - Sex trafficking by force, fraud or coercion of Jane Doe #6, in or about and between November 2007 and February 2010, in violation of 18 U.S.C. § 1591(a)(1) & (b)(1) (Count Seventeen) | Jane Doe #6 (Count Seventeen) |
| Odilon Martinez-Rojas | - Racketeering in or about and between December 2004 and November 2015, in violation of 18 U.S.C. § 1962(c) (Count One) | Jane Does #1 and 9 (Count One) |
| | - Sex trafficking by force, fraud or coercion of Jane Doe #9, in or about and between April 2010 and June 2014, in violation of 18 U.S.C. § 1591(a)(1) & (b)(1) (Count Twenty-Three) | Jane Doe #9 (Count Twenty-Three) |
| Severiano Martinez-Rojas | - Racketeering in or about and between December 2004 and November 2015, in violation of 18 U.S.C. § 1962(c) (Count One) | Jane Does #1, 3, 6-7 and 9 (Count One) |
| | - Sex trafficking by force, fraud or coercion of Jane Doe #7, in or about and between November 2007 and December 2008, in violation of 18 U.S.C. § 1591(a)(1) & (b)(1) (Count Nineteen) | Jane Doe #7 (Count Nineteen) |
| | - Sex trafficking by force, fraud or coercion of FBF, in or about and between February 2006 and November 2007, in violation of 18 U.S.C. § 1591(a)(1) & (b)(1) (Count One of NDGA Indictment)[5] | FBF (Count One of NDGA Indictment) |

The government's Guidelines estimates for each of the defendants are detailed in their respective plea agreements.

---

[5] In addition to pleading guilty to trafficking FBF, as part of the defendant's plea agreement, he also agreed to allocute to his participation in the sex trafficking of MSJ, in or about and between March 2007 and March 2008, in violation of 18 U.S.C. § 1591(a)(1) & (b)(1) (Count Three of NDGA Indictment), and Jane Doe #4 ("SAM"), in or about and between March 2007 and May 2008, in violation of 18 U.S.C. § 1591(a)(1) & (b)(1) (Count Five of NDGA Indictment).

APPLICABLE GUIDELINES

The Guidelines calculations in the PSRs differ from those in the plea

agreements in several respects.  First, the Probation Department applied Guidelines

§§ 2G1.1(c) and 2G1.3(c) (Sexual Abuse Cross Reference) to every sex trafficking predicate

act, whereas the plea agreement did so only when the underlying conduct fit the standard for

applicability of the sexual abuse guideline and the application of the cross-reference resulted

in an offense level that was higher than that applicable under §§ 2G1.1 or 2G1.3.

Second, the Probation Department applied Guideline § 3A1.1(b) (Vulnerable

Victim Adjustment) to every sex trafficking predicate act for every defendant, whereas the

plea agreements included it as applicable only where a defendant was a victim's primary

trafficker, or was otherwise significantly involved in the trafficking, and thus had a

reasonable opportunity to know of a victim's vulnerabilities.  In addition, even where a

defendant was intimately involved with a specific victim, the government did not include the

vulnerable victim enhancement in its plea agreement estimates in the rare circumstances that

the victim did not exhibit the type of vulnerabilities described in Application Note 2 to

Guideline § 3A1.1.

Third, the Probation Department applied several specific offense

characteristics in Guideline § 2L1.1 (Alien Smuggling), which the plea agreements did not

include in the government's estimate of the applicable Guidelines.  As discussed infra, this

discrepancy does not ultimately affect the Guidelines calculation applicable here.

Fourth, the Probation Department applied a specific offense characteristic

when calculating the base offense level for money laundering that the plea agreements did

not otherwise contemplate.  Finally, the PSRs grouped the alien smuggling and money

laundering offenses under Guideline § 3D1.2, whereas the plea agreements did not.  See, e.g., J. Rendon-Reyes PSR ¶¶ 54 & 96.  These discrepancies are discussed below, as are the Guidelines specifically applicable to each defendant.

I.      Applicability of Guidelines §§ 2G1.1(c) and 2G1.3(c)

Guidelines §§ 2G1.1(c) and 2G1.3(c) both provide that Guideline § 2A3.1 applies when the offense involved sexual abuse or aggravated sexual abuse, as described in 18 U.S.C. §§ 2241 and 2242.  Section 2G1.3(c) explicitly states that the cross-reference applies "if the resulting offense level is greater than that determined above," i.e., greater than the offense level based on an analysis of § 2G1.3 alone.  U.S.S.G. § 2G1.3(c).  Section 2G1.1 does not, however, include the caveat that the cross-reference is only applicable if the resulting offense level is higher.  Against the backdrop of this anomalous inconsistency in the Guidelines as between §§ 2G1.1(c) and 2G1.3(c), and to ensure the defendants were on full notice of the potential consequences of their guilty pleas, the government applied the cross-reference to the criminal sexual abuse guideline (§ 2A3.1) only when the cross-reference resulted in a higher Guidelines estimate than the offense level based on application of the § 2G1.1 or § 2G1.3 Guideline alone.

II.     Applicability of Guideline § 3A1.1

Guideline § 3A1.1(b) provides for a two level adjustment "[i]f the defendant knew or should known that a victim of the offense was a vulnerable victim."  A vulnerable victim is a person "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  U.S.S.G. § 3A1.1, Application Note 2.  Here, although the Probation Department is generally correct in its determination that the victims in this case were vulnerable because they were "young, poor,

and uneducated [victims] from impoverished areas of Mexico," <u>see, e.g.</u>, J. Rendon-Reyes PSR ¶ 6, the government undertook a detailed defendant-specific analysis in determining whether to include the vulnerable victim enhancement in the guideline estimates in the plea agreements.  <u>See also</u> <u>United States v. Valenzuela</u>, 495 Fed. App'x 817, 821 (9th Cir. 2012) (applying adjustment "where [v]ictims were predominantly poor, uneducated, far from home and without connections in the United States, unable to speak English, and unwilling to go to the police for fear of deportation"); <u>United States v. Jimenez-Calderon</u>, 183 Fed. App'x 274, 279-80 (3d Cir. 2006) ("These girls were young, uneducated, naive and from extremely impoverished families.").

The commentary to Section 3A1.1, however, further provides that the vulnerable victim enhancement should be applied when "the defendant knows or should have known of the victim's unusual vulnerability."  U.S.S.G. § 3A1.1, Application Note 2.  In circumstances where the government has limited evidence of a defendant's interactions with and/or knowledge about the specifics of a particular Jane Doe, the government did not include the vulnerable victim enhancement in the Guidelines estimate in the plea agreement as to that victim for that defendant.  Because the government does not anticipate being able to establish every defendant's knowledge of every particular victim's vulnerabilities at a sentencing hearing by a preponderance of the evidence, the government respectfully submits that the Court should adopt the government's analysis of this enhancement, and find this enhancement when it was included in the defendant's plea agreement.

III.  <u>Alien Smuggling Guidelines</u>

Guideline § 2L1.1(b) provides for multiple specific offense characteristics that increase the base offense level.  In the plea agreements, the government did not include three

specific offense characteristics in its Guideline estimates, including (1) unaccompanied minor, § 2L1.1(b)(4); (2) serious bodily injury, § 2L1.1(b)(7)(B); and (3) detention through coercion and threats, § 2L1.1(b)(8)(A).  As calculated by the Probation Department, certain of the enhancements may apply to certain defendants where that defendant was involved in the smuggling or had reason to know of conduct warranting the application of the enhancement.  However, in this case, the Probation Department included all of the enhancements for every defendant, estimating an adjusted offense level of 25 for the alien smuggling and transportation conspiracy in every PSR.  Because each defendant had specific roles vis-à-vis specific victims, however, a more fact-intensive inquiry is needed as to these enhancements, and the Probation Department's estimate of an adjusted offense level of 25 for the alien smuggling and transportation conspiracy is not applicable to all of the defendants.  In any event, because the alien smuggling adjusted offense level is more than 9 levels less serious than the defendants' other offense conduct, the Guidelines applicable to the alien smuggling conduct do not ultimately have an impact on the overall Guidelines calculations for any defendant.

A.    <u>Unaccompanied Minor, Guideline § 2L1.1(b)(4)</u>

The Probation Department applied Guideline § 2L1.1(b)(4) after determining that the alien smuggling conspiracy involved unaccompanied minors.  <u>See, e.g.</u>, J. Rendon-Reyes PSR ¶ 83.  Since the conspiracy involved the smuggling of Jane Does #3 and 5, who were 14 and 17 at the time, without their parents, relatives, or legal guardians, this two-level increase would apply to the defendants involved in the smuggling of these two victims.  As to Jane Doe #3, the defendants as to whom § 2L1.1(b)(4) would apply include Jose Rendon-Garcia, <u>see</u> Jose Rendon-Garcia PSR ¶ 88, and Guillermina Rendon-Reyes, <u>see</u> Guillermina

Rendon-Reyes PSR ¶ 85.  As to Jane Doe #5, the defendants as to whom § 2L1.1(b)(4) would apply include Jovan Rendon Reyes, <u>see</u> J. Rendon-Reyes PSR ¶ 83, and Felix Rojas, <u>see</u> Felix Rojas PSR ¶ 97.

B.     <u>Serious Bodily Injury, Guideline § 2L1.1(b)(7)(B)</u>

The Probation Department applied Guideline § 2L1.1(b)(7)(B) after determining that the alien smuggling conspiracy involved serious bodily injury.  <u>See, e.g.</u>, J. Rendon-Reyes PSR ¶ 84.  Application note 4 to Guideline 2L1.1 states that "'serious bodily injury' is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2422 or any similar offense under state law." Since the alien smuggling conspiracy's ultimate aim was the forcible sex trafficking conduct alleged in this case, a four-level increase under this Guideline may be appropriate.  However, as discussed above, the inclusion of this enhancement is not likely to impact the total adjusted offense level for any defendant given the relative seriousness of this conduct compared to the sex trafficking charges that form the basis for the guilty pleas here.

C.     <u>Involuntary Detention, Guideline § 2L1.1(b)(8)(A)</u>

Finally, the Probation Department applied Guideline § 2L1.1(b)(8)(A) after determining that the alien smuggling conspiracy involved involuntary detention through coercion and threats.  <u>See, e.g.</u>, J. Rendon-Reyes PSR ¶ 84.  Since the alien smuggling conspiracy's ultimate aim was to facilitate the forcible sexual conduct alleged in this case, a two-level increase under this Guideline may be appropriate.  However, as discussed <u>supra</u>, this enhancement is not likely to impact the total adjusted offense level for any defendant.

*  *  *  *  *

Notwithstanding the possible applicability of these Guidelines, given that these specific offense characteristics were not included in the Guidelines estimates included in the plea agreements, the government does not now seek a sentence above the Guidelines calculations included in the agreements, and advocates for a sentence within the Guidelines range contained in the plea agreements as to each defendant.

IV.    Money Laundering Guidelines

A.    Guideline § 2S1.1

Guideline § 2S1.1 provides that "[t]he offense level for the underlying offense from which the laundered funds were derived" should apply if the defendant committed the underlying offense. In this case, the underlying offense is sex trafficking and related prostitution activity. The Guidelines for sex trafficking are §§ 2G1.1 (Sex Trafficking of Adults) and 2G1.3 (Sex Trafficking of Minors), which both have a base offense level of 34 when force, fraud, or coercion is used. In drafting the plea agreements, the government inadvertently did not consider the specific offense characteristics of Guidelines §§ 2G1.1 and 2G1.3 as potential enhancements to the adjusted offense level for money laundering, and estimated that the applicable money laundering offense level was 34, the base offense level under §§ 2G1.1 and 2G1.3. In calculating the adjusted offense level for money laundering in the PSRs, the Probation Department applied a two-level increase "due to age" or "commission of a sex act," resulting in an offense level of 36. See, e.g., J. Rendon-Reyes PSR ¶ 90; O. Martinez-Rojas PSR ¶ 125. Although not explicated, it appears that the Probation Department relied on the Guidelines for the sex trafficking of Jane Does #3 and 5, who were 14 and 17 years old, to achieve that two-level increase. However, following the Probation Department's reasoning, the offense level should be 38, after adding two levels for

29

undue influence per Guideline § 2G1.3(b)(2)(B) and two levels for commission of a sex act per Guideline § 2G1.3(b)(4).  J. Rendon-Reyes PSR ¶¶ 52, 68-70.[6]

Notwithstanding the foregoing, because the government did not include the application of these specific offense characteristics in the plea agreements as to the money laundering offense conduct, the government does not now seek an upward adjustment above the Guidelines calculation included in the agreements.  Moreover, as a practical matter, because money laundering and sex trafficking should group, as discussed next, the combined offense level applicable to the money laundering charges has no impact on the calculation of the total adjusted offense levels.

B.      Applicability of § 3D1.2

Application Note 6 to Guideline § 2S1.1 provides that "[i]n a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to subsection (c) of § 3D1.2."  See United States v. Sabbeth, 277 F.3d 94, 97 (2d Cir. 2002) (construing § 2S1.1, cmt. n.6).  Section 3D1.2(c) in turn provides that counts should be grouped "[w]hen one of the counts embodies conduct that is a treated as a specific offense characteristic in . . . the guideline applicable to another of the counts."  In its estimate in the plea agreements, the government did not group the money laundering predicate acts with the sex trafficking and alien harboring predicates; rather, the money laundering was treated as a

---

[6] The approach for determining the offense level applicable for the sex trafficking of Jane Doe #3 should be the same as that taken to calculating the offense level applicable to the sex trafficking of Jane Doe #5.  The Probation Department calculated them differently, which is addressed in the discussion pertaining to defendant Severiano Martinez-Rojas's Guidelines.

separate unit under the multiple count analysis.  However, based on the text of the Guidelines commentary and per <u>Sabbeth</u>, the Probation Department's conclusion appears to be correct.

ANALYSIS

In the Supreme Court's opinion in <u>United States v. Booker</u>, 543 U.S. 220 (2005), which held that the Sentencing Guidelines are advisory not mandatory, the Supreme Court made clear that district courts are still required to consider Guidelines ranges in determining sentence, but also may tailor the sentence in light of other statutory concerns. <u>See</u> 18 U.S.C. § 3553(a).

Thereafter, in <u>Gall v. United States</u>, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." <u>Gall</u>, 552 U.S. at 49 (citation omitted).  Next, a sentencing court should "consider all of the 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented." <u>Id.</u> at 49-50 (citation and footnote omitted).

Here, the defendants' crimes of conviction are extremely serious and the defendants caused significant pain and suffering to many women and girls over a period of years.  The Court should thus fashion a sufficiently severe sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

Sex trafficking is a horrendous crime that strips victims of their dignity and self-worth, causing them unimaginable damage, and it warrants a strong deterrent effort through imposition of significant sentences. As detailed in the PSR and set forth above, the defendants treated the young women and girls in this case like a commodity, forcing them to have sex with countless men and subjecting them to brutal violence, sexual assaults, forced abortions, and mental and emotional harm. The defendants' acts were not aberrational, but rather, part of a pattern of abusive conduct designed to earn maximum profit at the victims' expense. Each of the defendants was personally involved in victimizing at least one young women or girl, and almost all of the defendants were involved in victimizing more than one. Accordingly, the Court should fashion sentences in this case that appropriately punish these defendants, including sentences at the high end of the Guidelines, as estimated in the plea agreements, for the most culpable and violent of the defendants.

I.    Jovan Rendon-Reyes

       A.    Applicable Guidelines

       For defendant Jovan Rendon-Reyes, in the plea agreement, the government estimated his adjusted offense level as 44. Reducing that level by three points for acceptance of responsibility and two points for a global resolution, the offense level estimated in the plea agreement was 39, with a Guidelines imprisonment range of 262 to 327 months. There are certain differences in the Guidelines calculation in the plea agreement and the PSR for Jovan Rendon-Reyes, as follows:

- As to Jane Doe #1, in the PSR, the Guidelines calculation for Count 1, Racketeering Act 3(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2). The plea agreement's estimate was not based on the cross-reference because, in both calculations, the adjusted offense level for Jane Doe #1 as to this defendant is a level 36.

32

- As to Jane Doe #5, in the PSR, the Guidelines calculation for Count 14, Racketeering Act 7(a) includes a 2-level vulnerable victim enhancement; the government did not include that adjustment based on its determination that Jane Doe #5, although a minor, was not unusually susceptible or vulnerable.  However, the plea agreement included a 2-level upward adjustment for Jovan Rendon-Reyes's leadership role in the recruitment and trafficking of Jane Doe #5, which estimate was not included in the PSR.  In both calculations, the adjusted offense level for Jane Doe #5 as to Jovan Rendon-Reyes is a level 40.

- As to Jane Doe #6, in the PSR, the Guidelines calculation for Count 1, Racketeering Act 8(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2).  The plea agreement's estimate was not based on the cross-reference. In both calculations, the adjusted offense level for Jane Doe #6 as to this defendant is a level 36.

- For the alien smuggling/transportation group, in the PSR, the Guidelines estimate was 25 as discussed above.  The government's estimate was lower.  For Jovan Rendon-Reyes, the unaccompanied minor enhancement is appropriate due to his role in smuggling Jane Doe #5, while the remaining enhancements may likewise be appropriate as discussed above.  However, even applying all of the enhancements included in the PSR, because the adjusted offense level for this group is 25, and is thus greater than 9 levels less serious than the other more serious conduct in the case, the guideline calculation for this group has no impact on the final guideline calculation.

- For the money laundering group, the plea agreement treated that conduct as a separate unit in the multiple count analysis whereas the PSR grouped that conduct with the sex trafficking charges as discussed above, resulting in a one-point reduction in the multiple count analysis.

Overall, taking into consideration acceptance of responsibility and the 2-level global adjustment included in the government's plea agreement, the government's estimate of the total adjusted offense for Jovan Rendon-Reyes was level 39, with an applicable Guidelines range of 262 to 327 months.  The PSR's calculation is a level 40, with an applicable Guidelines range of 292 to 365 months.  J. Rendon-Reyes PSR ¶ 135.  The PSR estimate did not, however, include the 2-point downward adjustment recommended by the government due to the defendants' determination to plead guilty as part of a global resolution

of this case.  If that 2-point reduction is awarded, defendant Jovan Rendon-Reyes's adjusted

offense level is 38, with an applicable Guidelines range of 235 to 293 months.

        B.    <u>Analysis</u>

        The government respectfully submits that the Court should sentence defendant

Jovan Rendon-Reyes to a sentence of 293 months, the high end of the PSR's calculated

Guidelines range 235 to 293 months.  For more than a decade, the defendant preyed on,

manipulated and assaulted young women for his own profit and sexual gratification.  As

discussed above, Jane Doe #5 was only 16 years old when the defendant raped her and

forced her into prostitution.  Shortly thereafter, when Jane Doe #5 was 17 years old, the

defendant had her smuggled into the United States, where she was again forced to prostitute.

Jovan Rendon-Reyes abused her physically, beating her when she did not earn enough

money.  For seven years, Jovan Rendon-Reyes controlled Jane Doe #5 with violence,

manipulation and fear.  In addition, as a member of the family and enterprise, Jovan Rendon-

Reyes helped his family manipulate and abuse numerous other women, including Jane Doe

#1 and Jane Doe #6.  The defendant's repeated and heinous acts, involving the abuse and

manipulation of young women, merits a significant and serious sentence and a sentence of

293 months, or approximately 24 years, would appropriately reflect the serious nature of his

conduct while also taking into consideration the requisite Section 3553(a) factors.

II.    <u>Saul Rendon-Reyes</u>

        A.    <u>Applicable Guidelines</u>

        For defendant Saul Rendon-Reyes, in the plea agreement, the government

estimated his adjusted offense level as 40.  Reducing that level by three points for acceptance

of responsibility and two points for a global resolution, the offense level estimated in the plea

agreement was 35, with a Guidelines imprisonment range of 168 to 210 months.  There are

certain differences in the Guidelines calculation in the plea agreement and the PSR for Saul

Rendon-Reyes, as follows:

- As to Jane Doe #1, in the PSR, the Guidelines calculation for Count 1, Racketeering Act 3(b) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2).  The plea agreement's estimate was not based on the cross-reference because, in both calculations, the adjusted offense level for Jane Doe #1 as to this defendant is a level 36.

- As to Jane Doe #2, in the PSR, the Guidelines calculation for Count 1, Racketeering Act 4(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2).  The plea agreement's estimate was not based on the cross-reference because, in both calculations, the adjusted offense level for Jane Doe #2 as to this defendant is a level 36.

- As to Jane Doe #7, in the PSR, the Guidelines estimate for Count 1, Racketeering Act 9(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2).  The plea agreement's estimate was not based on the cross-reference because, in both calculations, the adjusted offense level for Jane Doe #7 as to this defendant is a level 36.

- For the alien smuggling/transportation group, in the PSR, the Guidelines estimate was 25 as discussed above.  As to Saul Rendon-Reyes, the government does not have specific evidence to prove his involvement in the transportation of unaccompanied minors, although the other two enhancements included in the PSR may be appropriate as discussed above.  However, because the adjusted offense level for this group is 21, and is thus greater than 9 levels less serious than the other more serious conduct in the case, the guideline calculation for this group has no impact on the final guideline calculation.

- For the money laundering group, the plea agreement treated that conduct as a separate unit in the multiple count analysis whereas the PSR grouped that conduct with the sex trafficking charges as discussed above, resulting in a one-point reduction in the multiple count analysis.

Taking into consideration acceptance of responsibility and the 2-level global

adjustment included in the government's plea agreement, the government's estimate of the

total adjusted offense for Saul Rendon-Reyes was a level 35, with an applicable Guidelines

range of 168 to 210 months.  The PSR's calculation is a level 36, with an applicable

Guidelines range of 188 to 235 months.  S. Rendon-Reyes PSR ¶ 140.  The PSR estimate did

not, however, include the 2-point downward adjustment recommended by the government

due to the defendants' determination to plead guilty as part of a global resolution of this case.

If that 2-point reduction is awarded, defendant Saul Rendon-Reyes's adjusted offense level

would be level 34, with an applicable Guidelines range of 151 to 188 months.

      B.    <u>Analysis</u>

          The government respectfully submits that the Court should sentence defendant

Saul Rendon-Reyes to 188 months in prison, which is at the high end of the Guidelines range

of 151 to 188 months set forth in the PSR.  The defendant's callous crimes and the trauma he

imposed on his victims necessitates a serious sentence.  The defendant brutally victimized

Jane Doe #2, and his sentencing letter admits as much, describing his beatings of her in

visceral detail.  In addition to the beatings, he forced her to have sex with countless men for

his own profit, including just days after giving birth.  He also deprived her of food, the same

tactic he used to force Jane Doe #1 to have sex with him.  The defendant acknowledges in his

letter that there is no excuse for his crimes, that "his conduct was brutal, exploitative, and

cruel," and that "he must be severely punished."

          At the same time, the defendant attempts to use his childhood and upbringing

in Tenancingo to explain away his crimes and argue for a mandatory minimum sentence.

Like co-defendant Odilon Martinez-Rojas, discussed <u>infra</u>, the defendant was old enough to

make the decision to force Jane Doe #2 to prostitute.  The defendant claims to have had

legitimate work as an adult in Queens, and yet, he chose to forgo that work to make money

by selling Jane Doe #2 to countless men for sex for his own profit.  The defendant also

admits to being involved in the prostitution of numerous other victims.  Lastly, the defendant

claims to have "cognitive deficiencies," though certainly not enough to limit his ability to carry out a scheme to compel Jane Doe #2 to prostitute or understand the gravity of his crimes. The Court should thus reject these arguments and sentence the defendant to the high end of the applicable Guidelines range, thus fashioning a sufficiently severe sentence to appropriately punish Saul Rendon-Reyes for his conduct, while taking into consideration all of the factors enumerated in Section 3553(a).

III.   Guillermina Rendon-Reyes

    A.   Applicable Guidelines

For defendant Guillermina Rendon-Reyes, in the plea agreement, the government estimated her adjusted offense level as 41. Reducing that level by three points for acceptance of responsibility and two points for a global resolution, the offense level estimated in the plea agreement was 36, with a Guidelines imprisonment range of 188 to 235 months. There are certain differences in the Guidelines calculation in the plea agreement and the PSR for Guillermina Rendon-Reyes, as follows:

- The PSR includes as relevant conduct the trafficking of Jane Doe #2, as alleged in Count One, Racketeering Act 4(a), and Count Nine, as to which the PSR estimates an adjusted offense level of 36, which adds one level to the multiple count analysis. See G. Rendon-Reyes PSR ¶ 97. The plea agreement did not include this conduct in its estimate because the defendant Guillermina Rendon-Reyes is not named in the indictment as to these counts. The PSR's treatment of this as relevant conduct is appropriate, but the government does not seek to prove this conduct as to Guillermina Rendon-Reyes at a Fatico hearing and does not seek an upward adjustment of the defendant's sentence on the basis of this conduct.

- For the alien smuggling/transportation group, in the PSR, the Guidelines estimate was 25 as discussed above. As to Guillermina Rendon-Reyes, the enhancements anticipated in the PSR are applicable, including the 4-level upward adjustment for transportation of unaccompanied minors in light of this defendant's role in assisting in the smuggling of underage females across the border to facilitate their trafficking. However, because the adjusted offense level for this group is 25, and is thus greater

37

than 9 levels less serious than the other more serious conduct in the case, the guideline calculation for this group has no impact on the final guideline calculation.

- For the money laundering group, the plea agreement treated that conduct as a separate unit in the multiple count analysis whereas the PSR grouped that conduct with the sex trafficking charges as discussed above, resulting in a one-point reduction in the multiple count analysis.

Taking into consideration acceptance of responsibility and the 2-level global adjustment included in the government's plea agreement, the government's estimate of the total adjusted offense for Guillermina Rendon-Reyes was a level 36, with an applicable Guidelines range of 188 to 235 months.  The PSR's calculation is a level 38, with an applicable Guidelines range of 235 to 293 months.  G. Rendon-Reyes PSR ¶ 135.  The PSR estimate did not, however, include the 2-point downward adjustment recommended by the government due to the defendants' determination to plead guilty as part of a global resolution of this case.  If that 2-point reduction is awarded, defendant Guillermina Rendon-Reyes's adjusted offense level would be level 36, with an applicable Guidelines range of 188 to 235 months, consistent with the government's estimate in the plea agreement.

B.    Analysis

The government respectfully submits that the Court should sentence defendant Guillermina Rendon-Reyes to a sentence within the applicable Guidelines range of 188 to 235 months.  As detailed in the PSR, the defendant played a role in the sex trafficking of three victims.  She used threats and intimidation to compel Jane Doe #5 to prostitute for co-defendant Jovan Rendon-Reyes in Queens while he remained in Mexico.  She also helped co-defendant Jose Rendon-Garcia sex traffic Jane Doe #3, a 14-year-old, by smuggling her into the United States to prostitute while posing as her aunt.  In addition, she instructed Jane Doe #2 how to prostitute to help co-defendant Saul Rendon-Reyes sex traffic her.

Guillermina Rendon-Reyes thus played an important role in the family enterprise, and her repeated criminal acts, over a period of years, contributed directly to the victimization of multiple young women and girls.  A Guidelines sentence reflects the seriousness of such conduct, while not being greater than necessary to meet the goals of sentencing.

IV.    Francisco Rendon-Reyes

    A.    Applicable Guidelines

        For defendant Francisco Rendon-Reyes, in the plea agreement, the government estimated his adjusted offense level as 36.  Reducing that level by three points for acceptance of responsibility and two points for a global resolution, the offense level estimated in the plea agreement was 31, with a Guidelines imprisonment range of 108 to 135 months.  There are certain differences in the Guidelines calculation in the plea agreement and the PSR for Francisco Rendon-Reyes, as follows:

- As to Jane Doe #2, in the PSR, the Guidelines calculation for Count 1, Racketeering Act 4(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2).  The plea agreement's estimate was not based on the cross-reference because, in both calculations, the adjusted offense level for Jane Doe #2 as to this defendant is a level 36.

- As to Jane Doe #6, the PSR includes as relevant conduct for Francisco Rendon-Reyes a calculation for sex trafficking conduct related to Jane Doe #6 charged in Racketeering Act 8(a).  In the indictment, however, the defendant Francisco Rendon-Reyes is not named in the subpredicate charging sex trafficking for Jane Doe #6 (Racketeering Act 8(a)).  Rather, Francisco Rendon-Reyes is charged in Racketeering Act 8(b), which alleged the interstate prostitution of Jane Doe #6.  Although it was likely foreseeable to Francisco Rendon-Reyes that his co-conspirators would use force, fraud and coercion to cause Jane Doe #6 to engage in prostitution, the government does not have sufficient evidence to prove his knowledge of those means by a preponderance of the evidence.  Accordingly, as to Racketeering Act 8(a), the Court should adopt the government's Guidelines estimate (level 18), not the calculation included in the PSR.  F. Rendon-Reyes PSR ¶¶ 67-72.

- As to Jane Doe #10, the Guidelines calculation for Count 1, Racketeering Act 12(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2).

The plea agreement's estimate was not based on the cross-reference because the witness information and wiretap evidence in this case does not support the conclusion that Francisco Rendon-Reyes used force and threats against Jane Doe #10, his wife. Accordingly, as to Racketeering Act 12(a), the Court should adopt the government's Guidelines estimate (level 14), not the calculation included in the PSR. F. Rendon-Reyes PSR ¶¶ 73-78.

- For the alien smuggling/transportation group, in the PSR, the Guidelines estimate was 25 as discussed above. As to Francisco Rendon-Reyes, the government does not have specific evidence to prove his involvement in the transportation of unaccompanied minors, although the other two enhancements included in the PSR may be appropriate as discussed above. However, because the adjusted offense level for this group would then be a level 21, and is thus greater than 9 levels less serious than the other more serious conduct in the case, the guideline calculation for this group has no impact on the final guideline calculation.

Taking into consideration acceptance of responsibility and the 2-level global adjustment included in the government's plea agreement, the government's estimate of the total adjusted offense for Francisco Rendon-Reyes was a level 31, with an applicable Guidelines range of 108 to 135 months. The PSR's calculation is a level 36, with an applicable Guidelines range of 188 to 235 months. F. Rendon-Reyes PSR ¶ 124. The PSR estimate did not, however, include the 2-point downward adjustment recommended by the government due to the defendants' determination to plead guilty as part of a global resolution of this case. If that 2-point reduction is awarded, defendant Francisco Rendon-Reyes's adjusted offense level would be level 34, with an applicable Guidelines range of 151 to 188 months.

B.    Analysis

The government respectfully submits that the Court should sentence the defendant Francisco Rendon-Reyes to the high end of the applicable Guidelines range estimated in the plea agreement, namely, 135 months in prison. Although less violent and prolific than other members of the Organization, the defendant was an important member of

his family's sex trafficking business. He was based primarily out of the family home in Queens, New York, where many of the victims of the Organization were brought during the course of their trafficking. As discussed above, for example, when Jane Doe #2 was first brought to Francisco's house, he, along with his family members, refused to give her any food, feminine hygiene products or clothing unless she prostituted. When she finally succumbed and began working, he provided her with condoms and instructions about how to carry the condoms. When other victims were brought to the house, he provided the drivers and contact information necessary for prostitution. In addition, the defendant brought Jane Doe #10 to the United States in 2007. For almost ten years, the defendant facilitated and promoted Jane Doe #10's work in prostitution, and he and sent proceeds from her prostitution earnings to his family in Mexico. Taking this conduct, and his role in the Organization into account, a sentence at the high end of the applicable range of 108 to 135 months in prison is appropriate to promote respect for the law, to reflect the seriousness of the defendant's conduct and to promote specific and general deterrence, and to limit unwarranted sentencing disparities as compared to the other defendants in this case and similar cases.

V.     Jose Rendon-Garcia

    A.     Applicable Guidelines

        For defendant Jose Rendon-Garcia, in the plea agreement, the government estimated his adjusted offense level as 42. Reducing that level by three points for acceptance of responsibility and two points for a global resolution, the offense level estimated in the plea agreement was 37, with a Guidelines imprisonment range of 210 to 262 months. There are

certain differences in the Guidelines calculation in the plea agreement and the PSR for Jose

Rendon-Garcia, as follows:

- As to Jane Doe #3, in the PSR, the Guidelines calculation for Count 1, Racketeering Act 5(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2), while the plea agreement's estimate was not based on the cross-reference. The PSR's estimate does, however, appear to be correct since the application of the cross-reference results in a higher adjusted offense level. In addition, the PSR includes a 2-level vulnerable victim enhancement for Jane Doe #3; the government did not include that adjustment based on its determination that Jane Doe #3, although a minor, was not unusually susceptible or vulnerable.

- As to Jane Doe #5, in the PSR, the Guidelines calculation for Count 1, Racketeering Act 7(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2). The plea agreement's estimate was not based on the cross-reference because, in the government's calculation, the adjusted offense level for Jane Doe #5 under § 2G1.3 is higher than the level that results from the cross reference.[7] As detailed in the plea agreement, for Racketeering Act 7(a), the based offense level is 34, with 2 additional points added for undue influence of a minor (§ 2G1.3(b)(2)(B)) and 2 more points because the offense involved commercial sex acts (§ 2G1.3(b)(4)(A)), resulting in an adjusted offense level of 38. In contrast, the PSR estimated the applicable guideline to be an adjusted offense level of 34. Accordingly, as to Racketeering Act 7(a), the Court should adopt the government's Guidelines estimate (level 38), not the calculation included in the PSR. J. Rendon-Garcia PSR ¶¶ 80-85.

- Also as to Jane Doe #5, in the PSR, the Guidelines calculation for Count 1, Racketeering Act 7(a) includes a 2-level vulnerable victim enhancement; as discussed above, the government did not include that adjustment based on its determination that Jane Doe #5, although a minor, was not unusually susceptible or vulnerable. J. Rendon-Garcia PSR ¶ 82.

- As to Jane Doe #6, in the PSR, the Guidelines estimate for Count 1, Racketeering Act 8(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2). The plea agreement's estimate was not based on the cross-reference because, in both calculations, the adjusted offense level for Jane Doe #6 as to this defendant is a level 36.

---

[7] The government also notes that this cross-reference was not applied in the Guidelines calculations pertaining to Jane Doe #5 in the PSRs for other defendants who were named in Racketeering Act 7(a). See J. Rendon-Reyes PSR ¶¶ 68-74; G. Rendon-Reyes PSR, ¶¶ 70-76; F. Rojas PSR ¶¶ 83-88; and O. Martinez-Rojas PSR ¶¶ 79-85.

- As to Jane Doe #8, in the PSR, the Guidelines estimate for Count 1, Racketeering Act 10(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2).  The plea agreement's estimate was not based on the cross-reference because, in both calculations, the adjusted offense level for Jane Doe #8 as to this defendant is a level 36.

- For the alien smuggling/transportation group, in the PSR, the Guidelines estimate was 25 as discussed above.  However, even applying all of the enhancements included in the PSR, because the adjusted offense level for this group is 25, and is thus greater than 9 levels less serious than the other more serious conduct in the case, the guideline calculation for this group has no impact on the final guideline calculation.

- For the money laundering group, the plea agreement treated that conduct as a separate unit in the multiple count analysis whereas the PSR grouped that conduct with the sex trafficking charges as discussed above, resulting in a one-point reduction in the multiple count analysis.

Taking into consideration acceptance of responsibility and the 2-level global adjustment included in the government's plea agreement, the government's estimate of the total adjusted offense for Jose Rendon-Garcia was a level 37, with an applicable Guidelines range of 210 to 262 months.  The PSR's calculation is a level 39, with an applicable Guidelines range of 262 to 327 months.  J. Rendon-Garcia PSR ¶ 139.  The PSR estimate did not, however, include the 2-point downward adjustment recommended by the government due to the defendants' determination to plead guilty as part of a global resolution of this case. If that 2-point reduction is awarded, defendant Jose Rendon-Garcia's adjusted offense level would be level 37, with an applicable Guidelines range of 210 to 262 months, consistent with the government's estimate in the plea agreement.

B.    Analysis

The government respectfully submits that the Court should sentence the defendant Jose Rendon-Garcia to a Guideline sentence within the range of 210 to 262 months in prison.  The defendant was involved in bringing multiple women into the United States

and forcing them to prostitute.  Specifically, when Jane Doe #3 was only 14 years old, the

defendant raped her and then manipulated her into staying with her.  On at least one

occasion, he locked her in a room so that she could not leave.  He then smuggled her into the

United Sates using a fake birth certificate.  Once in the United States, the defendant

threatened her and her family in order to force her to prostitute.  When he did not think she

had earned enough, he would beat her — sometimes with a belt.  The defendant also

operated a brothel, where many of the young woman victimized by this enterprise were sent

and forced to work.  He also helped his family members, housing the young woman that they

had brought to the United States and helping ensure they prostituted themselves.  Given the

defendant's repeated and violent criminal acts, which preyed on young women and girls, a

sentence within the range of 210 to 262 months is sufficient, but not greater than necessary to

achieve the aims of sentencing.

VI.   Felix Rojas

    A.   Applicable Guidelines

        For defendant Felix Rojas, in the plea agreement, the government estimated

his adjusted offense level as 46.  Reducing that level by three points for acceptance of

responsibility and two points for a global resolution, the offense level estimated in the plea

agreement was 41, with a Guidelines imprisonment range of 324 to 405 months.  There are

certain differences in the Guidelines calculation in the plea agreement and the PSR for Felix

Rojas, as follows:

- As to Jane Doe #3, in the PSR, the Guidelines calculation for Count 1, Racketeering
  Act 5(a) is based on the cross-reference to the criminal sexual abuse guideline,
  § 2A3.1(a)(2), while the plea agreement's estimate was not based on the cross-
  reference because, in both calculations, the adjusted offense level for Jane Doe #3 as
  to this defendant is a level 36.  F. Rojas PSR ¶¶ 76-82.

- In addition, also as to Jane Doe #3, the PSR includes a 2-level vulnerable victim enhancement for Jane Doe #3; the government did not include that adjustment based on its determination that Jane Doe #3, although a minor, was not unusually susceptible or vulnerable. Accordingly, the government respectfully submits that the appropriate adjusted offense level for Jane Doe #3 is 36. F. Rojas PSR ¶ 82.

- As to Jane Doe #5, the PSR includes a 2-level vulnerable victim enhancement. The government did not include that adjustment based on its determination that Jane Doe #5, although a minor, was not unusually susceptible or vulnerable. Accordingly, the government respectfully submits that the appropriate adjusted offense level for Jane Doe #5 is 36. F. Rojas PSR ¶ 88.

- As to Jane Doe #6, although the PSR correctly applied the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2), the PSR erroneously omitted two enhancements. First, the PSR did not include the "'serious bodily injury' enhancement estimated in the plea agreement. The violence that Felix Rojas inflicted on Jane Doe #6 was severe and resulted in serious bodily injury: he beat Jane Doe #6 so violently that he induced an abortion, and he also burned her with a cigarette, among other injuries. Each of these injuries alone meets the definition of "serious bodily injury" set forth in the application notes to Guideline 1B1.1. Accordingly, the government respectfully submits that the Court should find that the 2-level enhancement for serious bodily injury applies here, per § 2A3.1(b)(4)(B). In addition, as detailed above, the defendant abducted Jane Doe #6 with her baby, under the guise of taking them to a fair, after which he held her in a home and then ultimately forced her to work in prostitution by using threats against her and her son, and violence, to ensure her compliance. Accordingly, the 4-level enhancement for abduction of a victim also applies, per § 2A3.1(b)(5). Finally, the government concurs that Jane Doe #6 was unusually vulnerable — the defendant abducted her and her infant child, and used her love for her son as a weapon to force her to work. Accordingly, the government respectfully submits that the appropriate adjusted offense level for Jane Doe #6 as to defendant Felix Rojas is a level 42. Compare to F. Rojas PSR ¶ 69.

- As to Jane Doe #7, in the PSR, the Guidelines estimate for Count 1, Racketeering Act 9(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2). The plea agreement's estimate was not based on the cross-reference because, in both calculations, the adjusted offense level for Jane Doe #7 as to this defendant is a level 34. The PSR also included a 2-level enhancement for vulnerable victim that was not included in the plea agreement.

- As to Jane Doe #8, in the PSR, the Guidelines estimate for Count 1, Racketeering Act 10(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2). The plea agreement's estimate was not based on the cross-reference because, in both calculations, the adjusted offense level for Jane Doe #8 as to this

defendant is a level 34.  The PSR also included a 2-level enhancement for vulnerable victim that was not included in the plea agreement.

- For the alien smuggling/transportation group, in the PSR, the Guidelines estimate was 25 as discussed above.  However, even applying all of the enhancements included in the PSR, because the adjusted offense level for this group is 25, and is thus greater than 9 levels less serious than the other more serious conduct in the case, the guideline calculation for this group has no impact on the final guideline calculation.

- For the money laundering group, the plea agreement treated that conduct as a separate unit in the multiple count analysis whereas the PSR grouped that conduct with the sex trafficking charges as discussed above, resulting in a one-point reduction in the multiple count analysis.

Taking into consideration acceptance of responsibility and the 2-level global adjustment included in the government's plea agreement, the government's estimate of the total adjusted offense for Felix Rojas was a level 41, with an applicable Guidelines range of 324 to 405 months.[8]

B.    Analysis

The government respectfully submits that the Court should sentence defendant Felix Rojas at the high end of the Guidelines range estimated in the plea agreement, namely to 405 months in prison.  Felix Rojas was directly and personally responsible for forcing Jane Doe #6 and Jane Doe #8 into prostitution, and his extraordinary violence against Jane Doe #6 warrants severe punishment.  In addition, a lengthy term of incarceration is appropriate to protect the public and other potential victims from this defendant.  As detailed in the PSR and above, defendant Felix Rojas used violence and manipulation to abuse the victims in this case and to profit personally.  With respect to Jane Doe #6, the defendant kidnapped her and

---

[8] The calculation in the PSR, which does not include the applicable enhancements for Jane Doe #6, was calculated at a level 41, without taking into consideration the 2-point downward adjustment for the global agreement.  Felix Rojas PSR ¶¶ 116 & 149.  For the reasons set forth above, however, the government does not agree with the PSR's estimate.

her child, leaving them in a room for weeks with limited food. He ultimately took away her child, leaving Jane Doe #6's son with one of the Rendon-Reyes family members (Jovan Rendon-Reyes's mother), and used constant threats of harm to her child to manipulate and control Jane Doe #6, requiring her to prostitute herself to avoid harm to herself and her young son. After he smuggled Jane Doe #6 into the United States, the defendant continued to use force and manipulation to control Jane Doe #6 and require her to work in prostitution. On one occasion, when he learned that Jane Doe#6 was pregnant, the defendant beat her forcefully and repeatedly until he caused her to have a miscarriage.

   The defendant also abused and manipulated Jane Doe #8. After romantically pursuing Jane Doe #8 and impregnating her, he convinced her to come to the United States for a better life. Once in the United States, the defendant forced Jane Doe #8 to prostitute if she wanted any food for herself or a place for her baby to live. As with Jane Doe #6, the defendant repeatedly beat Jane Doe #8. In addition, the defendant also helped his family do the same to Jane Doe #3, Jane Doe #5 and Jane Doe #7. The defendant's violence was extreme — even within the context of these crimes — and he caused lasting injury to the women that he abused both physically and emotionally. Given his frequent violence and significant role in the sex trafficking operation, his conduct warrants a very lengthy sentence. The government thus respectfully submits that a sentence of 405 months is appropriate, and not greater than necessary, to protect the public, promote respect for the law and to ensure specific incapacitation and deterrence.

VII.    Odilon Martinez-Rojas

      A.    Applicable Guidelines

          For defendant Odilon Martinez-Rojas, in the plea agreement, the government estimated his adjusted offense level as 43. Reducing that level by three points for acceptance of responsibility and two points for a global resolution, the offense level estimated in the plea agreement was 38, with a Guidelines imprisonment range of 235 to 293 months. There are certain differences in the Guidelines calculation in the plea agreement and the PSR for Odilon Martinez-Rojas, as follows:

- As to Jane Doe #1, in the PSR, the Guidelines calculation for Count 1, Racketeering Act 3(a) did not include a 2-level upward adjustment for serious bodily injury under Guideline § 2A3.1(b)(4)(B), which estimate was included in the plea agreement. See O. Martinez-Rojas Plea Agreement page 4. Based on the facts set forth supra, the cross-reference to the § 2A3.1 Guideline and application of the serious bodily injury enhancement is amply supported as to Odilon Martinez-Rojas's interactions with Jane Doe #1 — he physically assaulted her, injected her with unknown substances and he also required her to get a large tattoo, which was very painful to apply and later, after her escape from her trafficking situation, to have removed. Accordingly, the 2-level upward adjustment for serious bodily injury should be applied here, and the Court should adopt the government's estimated adjusted offense level of 38, not the PSR's estimate of 36.

- As to Jane Doe #4, in the PSR, the Guidelines estimate for Count 1, Racketeering Act 6(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2). The plea agreement's estimate was not based on the cross-reference. In both calculations, the adjusted offense level is a level 36.

- As to Jane Doe #5, for Count 1, Racketeering Act 7(a), the PSR applied the vulnerable victim adjustment under Guideline § 3A1.1(b). The government does not anticipate being able to prove that defendant Odilon Martinez-Rojas knew, or should have known, that Jane Doe #5 was uniquely vulnerable. In addition, the PSR mistakenly includes an additional 2-level increase to the adjusted offense level, reflecting a subtotal of 42, instead of 40, which affects the PSR's grouping analysis and combined adjusted offense level analysis for this defendant. At a correctly computed level 40, less 2 points for the vulnerable victim enhancement, the Court should adopt the government's estimate of 38 as the correct adjusted offense level with respect to defendant's Odilon Martinez-Rojas offense conduct as to Jane Doe #5.

- As to Jane Doe #6, in the PSR, the Guidelines estimate for Count 1, Racketeering Act 8(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2). The plea agreement's estimate was not based on the cross-reference. In both calculations, the adjusted offense level is a level 34.[9]

- As to Jane Doe #7, in the PSR, the Guidelines estimate for Count 1, Racketeering Act 9(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2). The plea agreement's estimate was not based on the cross-reference. In both calculations, the adjusted offense level is a level 34.[10]

- For the alien smuggling/transportation group, in the PSR, the Guidelines estimate was 25 as discussed above. However, even applying all of the enhancements included in the PSR, because the adjusted offense level for this group is 25, and is thus greater than 9 levels less serious than the other more serious conduct in the case, the guideline calculation for this group has no impact on the final guideline calculation.

- For the money laundering group, the plea agreement treated that conduct as a separate unit in the multiple count analysis whereas the PSR grouped that conduct with the sex trafficking charges as discussed above.

- In the multiple count analysis, the PSR erroneously states that the highest adjusted offense level was 42 (for Count 1, Racketeering Act 7(a)), when the correctly computed adjusted offense level for that predicate is a level 40. See O. Martinez-Rojas PSR ¶ 132. With that adjusted to a 40, the other groups, most of which are at an adjusted offense level of 36, should be treated as one unit in the multiple count analysis, for a total of up to 5 units. See U.S.S.G. § 3D1.4. Accordingly, under the PSR's analysis, the resultant adjusted offense level is a level 45, minus 3 levels for acceptance of responsibility, i.e., a total adjusted offense level of 42, with a range of imprisonment of 360 to life.

    In addition, with respect to Racketeering Act 11(a) (Jane Doe #9), the PSR did

not apply the 2-level obstruction adjustment under Guideline § 3C1.1, which was included in

---

[9] In addition, the PSR applied a 2-level vulnerable victim enhancement, which the government did not apply as to this defendant for Jane Doe #6 because the government does not have sufficient evidence to prove that Odilon Martinez-Rojas was on notice or should have known of Jane Doe #6's vulnerabilities given their interactions.

[10] In addition, the PSR applied a 2-level vulnerable victim enhancement, which the government did not apply as to this defendant for Jane Doe #7 because the government does not have sufficient evidence to prove that Odilon Martinez-Rojas was on notice or should have known of Jane Doe #7's vulnerabilities given their interactions.

the plea agreement.  <u>Compare</u> O Martinez-Rojas PSR ¶ 102 to S. Martinez-Rojas PSR ¶ 107.

As noted in the PSR, after defendant Odilon Martinez-Rojas's arrest in the Northern District

of Georgia, his brother, defendant Severiano Martinez-Rojas, "attempted to obstruct the

FBI's investigation by threatening Jane Doe #9 so that she would not speak to the police."

O. Martinez-Rojas PSR ¶ 29.  While the PSR highlights defendant Severiano Martinez-

Rojas's obstructive conduct, the evidence establishes defendant Odilon Martinez-Rojas's

involvement in that conduct by a preponderance of the evidence.  First, he forced Jane Doe

#9 to continue prostituting and to send money to his family while he was detained, which

was an effort to prevent her from cooperating from law enforcement.  Second, given their

join participation in the crimes of conviction, the evidence suggests that defendant Severiano

Martinez-Rojas was acting on his brother's behalf.  Additionally, defendant Severiano

Martinez-Rojas went to the home of Jane Doe #9's mother, to which only defendant Odilon

Martinez-Rojas had been previously, demonstrating that they were acting in concert in their

efforts to influence Jane Doe #9.  Finally, Adriana, who was primarily associated with

defendant Odilon Martinez-Rojas, also participated in the obstructive conduct.  Jane Doe #9

overheard conversations between Adriana and defendant Odilon Martinez-Rojas, including

on one occasion when he told Adriana not to let Jane Doe #9 leave, after she had told

Adriana she was planning to escape.  For these reasons, the Court should apply the 2-level

obstruction enhancement to defendant Odilon Martinez-Rojas based on his efforts to obstruct

and influence Jane Doe #9.

*　*　*　*　*

Taking into consideration acceptance of responsibility and the 2-level global

adjustment included in the government's plea agreement, the government's estimate of the

50

total adjusted offense for Odilon Martinez-Rojas was level 38, with an applicable Guidelines range of 235 to 293 months.  The PSR's estimate is a level 43 (which, as noted above, is based in part on an arithmetic error), with an applicable Guidelines range of life.  O. Martinez-Rojas PSR ¶ 175.  The PSR estimate did not, however, include the 2-point downward adjustment recommended by the government due to the defendants' determination to plead guilty as part of a global resolution of this case.

B.    Analysis

The government respectfully submits that the Court should sentence defendant Odilon Martinez-Rojas to a sentence at the high end of the applicable Guidelines range.  The defendant is responsible for brutally victimizing three vulnerable young women — Jane Does #1, #4 (SAM) and #9 — and helping his co-defendants do the same to at least five others — Jane Does #5, #6 and #7, FBF and MSJ.  His abusive and exploitative conduct was not a mere aberration.  For years, he lured multiple young women far from their homes and forced them to have sex with upwards of 45 men a night almost every night, all for his own greed.  He beat and raped Jane Doe #1 when she did not earn enough money, because she did not know how to prostitute.  He beat Jane Doe #4 when she tried to protect her friend, MSJ, who was a virgin.  And after Jane Doe #9 became pregnant with his baby, he forced her to take pills to induce a miscarriage and then violently beat her when she could not continue prostituting because she was bleeding for days.  He dragged her by the hair, threw her down and stomped on her face, snapping her nose, and continued punching and kicking her, causing substantial injuries.

A sentence at the high end of the applicable range would also avoid "unwarranted sentence disparities."  18 U.S.C. § 3553(a)(6).  Significantly, the defendant

was sentenced in January 2017 in the Northern District of Georgia to 262 months in prison

after pleading guilty to sex trafficking three victims — Jane Doe #4 (SAM), FBF, and MSJ.[11]

That sentence does not reflect the defendant's involvement in the sex trafficking of five

additional victims in this case — Jane Does #1, #5, #6, #7, and #9.  Nor does it reflect the

full extent of the defendant's violent conduct, including his beatings of Jane Does #1 and #9

and Jane Doe #9's forced abortion.  It also does not reflect the defendant's obstructive

conduct that thwarted law enforcement's efforts to investigate his sex trafficking of Jane Doe

#9 until years later.  Accordingly, a sentence at the high end of the applicable Guidelines

range is more than appropriate given the totality of his abhorrent crimes.

   In his sentencing letter, the defendant asks the Court to sentence him to 188

months in this case, which is a significant and unjustified departure from the Guidelines.  It is

also markedly less than the 262-month prison term imposed in the Northern District of

Georgia, where he was convicted of a subset of the conduct at issue in this case.  The

defendant's sentencing request seems not to appreciate that his conduct in this case is more

egregious and therefore deserving of a longer prison term than that which he is already

serving.  In support of his request, the defendant asks the Court to take into account his

childhood and upbringing in Tenancingo in an effort to deflect the full impact of his crimes

on his victims.  Judge Totenberg rejected that very argument when sentencing the defendant

to a Guidelines sentence in the Northern District of Georgia, stating on the record that the

defendant was old enough to decide whether to "inflict[] so much suffering and torture,

really, on a wide range of women."  See Exhibit F at p. 143 (excerpted transcript of

---

[11] The Guidelines range in that case was determined to be 262 to 327 months.

sentencing proceedings before the Honorable Amy Totenberg for defendants Arturo Rojas-Coyotl & Odilon Martinez-Rojas (NDGA Docket No. 13-CR-128, Jan. 22, 2015)).  The defendant also asks the Court to consider any effect that his continued imprisonment would have his family, the very same considerations that the defendant denied his victims.  He not only took them from their families but also caused them lasting, irreparable, and indescribable harm that necessitates a significant sentence at the high end of the applicable Guidelines range.

VIII.  <u>Severiano Martinez-Rojas</u>

A.  <u>Applicable Guidelines</u>

For defendant Severiano Martinez-Rojas, in the plea agreement, the government estimated his adjusted offense level as 43.  Reducing that level by three points for acceptance of responsibility and two points for a global resolution, the offense level estimated in the plea agreement was 38, with a Guidelines imprisonment range of 235 to 293 months.  There are certain differences in the Guidelines calculation in the plea agreement and the PSR for Severiano Martinez-Rojas, as follows:

- As to Jane Doe #1, in the PSR, the Guidelines estimate for Count 1, Racketeering Acts 3(a) & 3(b) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2).  The plea agreement's estimate was not based on the cross-reference.  In both calculations, the adjusted offense level is a level 36.

- As to Jane Doe #3, in the PSR, the Guidelines estimate for Count 1, Racketeering Act 5(a), is based on the cross-reference to the criminal sexual abuse Guideline, § 2A3.1(a)(2), resulting in a 36.  S. Martinez-Rojas PSR ¶¶ 77-83.  However, using § 2G1.3, the total offense level should be 38, which includes a 2-level increase for undue influence, per 2G1.3(b)(2)(B), and a 2-level increase for commission of a sex act, per 2G1.3(b)(4)(A).  <u>See</u> J. Rendon-Reyes PSR ¶¶ 52, 68-70 (calculation for Racketeering Act 7(a) (Jane Doe #5)).  The cross reference to the criminal sexual abuse guideline is only applicable when the resulting offense level is greater than the one under § 2G1.3.  U.S.S.G. § 2G1.3(c)(1).  The Court should thus adopt the

government's estimate of 38 as the correct adjusted offense level with respect to defendant's Severiano Martinez-Rojas offense conduct as to Jane Doe #3.[12]

- As to Jane Doe #4 (SAM), in the PSR, the Guidelines estimate for Count 5 of the NDGA Indictment is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2).  The plea agreement's estimate was not based on the cross-reference.  In both calculations, the adjusted offense level is a level 36.

- As to Jane Doe #6, in the PSR, the Guidelines estimate for Count 1, Racketeering Act 8(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2).  The plea agreement's estimate was not based on the cross-reference.  In both calculations, the adjusted offense level is a level 36.

- As to Jane Doe #7, in the PSR, the Guidelines estimate for Count 1, Racketeering Act 9(a) in the PSR, is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2).  The plea agreement's estimate was not based on the cross-reference.  In both calculations, the adjusted offense level is a level 34, plus 2 levels for vulnerable victim, resulting in an adjusted offense level of 36.  In addition, the plea agreement included a 2-level upward adjustment for the defendant's leadership role in the trafficking of Jane Doe #7, which is warranted due to the defendant's conduct in directing multiple others with regard to Jane Doe #7's trafficking, but which was not included in the PSR.  Based on the foregoing, the government respectfully submits that the Court should adopt the government's estimate of 38 as the correct adjusted offense level with respect to defendant's Severiano Martinez-Rojas offense conduct as to Jane Doe #7.

- As to Jane Doe #9, in the PSR, the Guidelines estimate for Count 1, Racketeering Acts 11(a) is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2).  The plea agreement's estimate was not based on the cross-reference.  In both calculations, the adjusted offense level is a level 38 with the appropriate enhancements added.

- With respect to Count One (FBF) of the NDGA Indictment, the Guidelines estimate is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2).  The plea agreement's estimate was not based on the cross-reference.  In both calculations, the adjusted offense level is a level 36, including the vulnerable victim enhancement.  The PSR did not, however, apply the aggravating role adjustment under Guideline § 3B1.1(c).  The government included this enhancement in the plea agreement estimate because the evidence supports it and U.S. District Court Judge Amy Totenberg for the Northern District of Georgia applied it to co-defendant Odilon Martinez-Rojas for the same conduct.  Guideline § 3B1.1(c) provides for a 2-level

---

[12] In addition, the PSR applied a 2-level vulnerable victim enhancement, which the government did not include in its estimate as Jane Doe #3.

increase if "the defendant was an organizer, leader, manager, or supervisor in any criminal activity." At a minimum, "there must be evidence that the defendant exerted some control, influence or decision making authority over another participant in the criminal activity.'" United States v. Offord, 579 Fed. App'x 834, 836 (11th Cir. 2014) (per curiam). Here, the defendant was in charge and exerted influence and decision-making authority over his much younger nephew and co-defendant, Arturo Rojas-Coyotl, and others involved in the trafficking of FBF. For example, the defendant provided advice to Rojas-Coyotl on how to control FBF, see United States v. Lozano, 490 F.3d 1317, 1324 (11th Cir. 2007) (affirming adjustment where defendant instructed a co-conspirator to engage in criminal conduct). Defendant Severiano Martinez-Rojas also instructed Rojas-Coyotl to cut FBF in her face when she challenged Rojas-Coyotl. S. Martinez-Rojas PSR ¶¶ 40-41. In addition, Severiano directed a female associate to groom FBF and directed drivers to transport FBF for prostitution after she arrived. S. Martinez-Rojas PSR ¶¶ 39-40. The evidence thus amply supports a 2-level enhancement for his role in the offense under § 3B1.1(c). The government thus respectfully submits that the Court should find that the appropriate adjusted offense level as to FBF for Severiano Martinez-Rojas is 38.

- With respect to Count Three (MSJ) of the NDGA Indictment, the Guidelines estimate is based on the cross-reference to the criminal sexual abuse guideline, § 2A3.1(a)(2). The plea agreement's estimate was not based on the cross reference. In either event, the adjusted offense level, including the vulnerable victim enhancement, is 36.

- For the alien smuggling/transportation group, in the PSR, the Guidelines estimate was 25 as discussed above. However, even applying all of the enhancements included in the PSR, because the adjusted offense level for this group is 25, and is thus greater than 9 levels less serious than the other more serious conduct in the case, the guideline calculation for this group has no impact on the final guideline calculation.

- For the money laundering group, the plea agreement treated that conduct as a separate unit in the multiple count analysis whereas the PSR grouped that conduct with the sex trafficking charges as discussed above.

*  *  *  *  *

Taking into consideration acceptance of responsibility and the 2-level global adjustment included in the government's plea agreement, the government's estimate of the total adjusted offense for Severiano Martinez-Rojas was level 38, with an applicable Guidelines range of 235 to 293 months. The PSR's estimate is a level 40, with an applicable Guidelines range of 292 to 365 months. S. Martinez-Rojas PSR ¶ 174. The PSR estimate

did not, however, include the 2-point downward adjustment recommended by the government due to the defendants' determination to plead guilty as part of a global resolution of this case.  If that 2-point reduction is awarded, defendant Severiano Martinez-Rojas's adjusted offense level would be level 38, with an applicable Guidelines range of 235 to 293 months, consistent with the government's estimate in the plea agreement.

    B.    <u>Analysis</u>

        The government respectfully submits that the Court should sentence defendant Severiano Martinez-Rojas to the high end of the applicable Guidelines range, consistent with the sentence that the government is requesting for co-defendant Odilon Martinez-Rojas. Like defendant Odilon Martinez-Rojas, defendant Severiano Martinez-Rojas was convicted for his role in trafficking FBF, SAM and MSJ, who had been a virgin at the time and whom the defendant tried to sexually assault.  Also like his co-defendant, the defendant was convicted for trafficking others in this case.  The defendant not only forced Jane Doe #7 to prostitute, he also used a trailer as a brothel in Alabama, where he prostituted other victims for his own profit.  Additionally, he raped Jane Doe #1, and he threatened Jane Doe #9 to prevent her from cooperating with law enforcement.  Accordingly, a sentence at the high end of the applicable range would reflect the seriousness of the defendant's abhorrent conduct and avoid any unwarranted sentencing disparities.

        Moreover, the defendant and his co-defendant Odilon Martinez-Rojas should receive the same sentence, or a substantially similar sentence, because they are similarly situated in terms of the number of victims that they assisted in trafficking, and such an approach would avoid an unwarranted sentencing disparity.  As set forth above, both Odilon and Severiano were indicted in the Northern District of Georgia for sex trafficking Jane Doe

#4 (SAM), FBF and MSJ and both pleaded guilty to that conduct.  In the Georgia case, Judge

Totenberg sentenced Odilon to 262 months in prison, while this Court will sentence

Severiano on both cases together.

    Like Odilon, defendant Severiano Martinez-Rojas's abusive and exploitative

conduct was not an aberration.  Over a span of years, he brutally victimized Jane Doe #7,

operated a brothel in Alabama that profited off of numerous sex trafficking victims, and

helped his co-defendants sex traffic six victims — Jane Doe #1, Jane Doe #4 (SAM), Jane

Doe #7, Jane Doe #9, MSJ and FBF.  He attempted to force himself on MSJ, who had her

virginity recently taken, to "teach" her how to prostitute, and he raped Jane Doe #1.  He also

threatened Jane Doe #9 to prevent her from cooperating with law enforcement.  A sentence at

the high end of the applicable Guidelines range is sufficient, but not greater than necessary,

to reflect the seriousness of the defendant's abhorrent conduct and also avoids any

sentencing disparities between him and his similarly situated co-defendants.

RESTITUTION

    The Court should order the defendants to pay restitution to the victims jointly

and severally in the amounts set forth below.  Victims of crime have "[t]he right to full and

timely restitution as provided in law," 18 U.S.C. § 3771(a)(6).  In sex trafficking cases, 18

U.S.C. § 1593 provides for mandatory restitution to the victims.  See, e.g., United States v.

Mammedov, 304 Fed. App'x 922, 927, 2008 WL 5411080, at *3 (2d Cir. Dec. 30, 2008)

(unpublished).

    Pursuant to § 1593(b), sex trafficking defendants are required to pay the "full

amount of the victim's losses," which includes the victim's actual losses and "the gross

57

income or value to the defendant of the victim's services."[13]  In interpreting this provision, the Second Circuit has unequivocally ruled that sex trafficking victims shall "receive restitution, notwithstanding that their earnings came from illegal conduct."  Mammedov, 304 Fed. App'x at 927; see also United States v. Cortes-Castro, 511 Fed. App'x 942, 947 (11th Cir. Mar. 7, 2013) (unpublished) (rejecting defendant's "preposterous" argument that "restitution rewards victims for their illegal activities" and holding that sex trafficking victims are "entitled to be 'made whole for their losses'").  Additionally, a restitution order under § 1593 "shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A."  Thus, a defendant's "economic circumstances" should have no bearing on a court's decision to enter such an order.  18 U.S.C. § 3664(f)(1)(A); In re Morning Star Packing Co., 711 F.3d 1142, 1144 (9th Cir. 2013) (holding district court committed legal error in denying restitution because of defendant's claimed financial status and potential availability of civil remedies).

The gross value of the victim's services to the defendant is determined by averaging the amount that a victim earned for the defendant for each commercial sex act and the amount of time the defendant forced the victim to engage in commercial sex acts.  United States v. Robinson, 508 Fed. App'x 867, 871 (11th Cir. 2013); In re Sealed Case, 702 F.3d

---

[13] Subsection (b)(3) provides for "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act."  In virtually every sex trafficking case, the value of the victim's services is greater than the amount the victim could have earned under the Fair Labor Standards Act.  See, e.g., United States v. Williams, __ F. Supp. 3d __, 2018 WL 2770640, at *3-4 (E.D. Va. June 8, 2018) (calculating restitution under § 1593 as both victim's prostitution proceeds, which totaled $119,300, and victim's deprived minimum wages, which totaled $6,102, and ordering the former as the greater of the two amounts).

58, 62 & n.1 (D.C. Cir. 2012); United States v. Webster, No. 08-30311, 2011 WL 8478276 (9th Cir. Nov. 28, 2011) (unpublished).  Although "such a determination will inevitably involve some degree of approximation," it is "not fatal."  In re Sealed Case, 702 F.3d at 66. "[T]he district court's charge is 'to estimate, based upon the facts in the record, the amount of [the] victim's loss with some reasonable certainty," not absolute certainty.  Id.; see also United States v. Baston, 818 F.3d 651, 665 (11th Cir. 2016) (holding that courts calculating restitution amounts are entitled to rely on any evidence "bearing 'sufficient indicia of reliability to support its probable accuracy'").

The defendants in this case forced the victims to engage in numerous commercial sex acts virtually every day for extended periods and took virtually all of the proceeds.  The evidence demonstrates that the defendants earned no less than $15 in profit from each commercial sex act.[14]  The number of clients that the victims were required to have sex with varied somewhat.  The victims reported having sex with as many as 45 a night, with the average number being around 20.  For example, Jane Doe #3, who was a minor, reported that Jose Rendon-Garcia required her to earn $300 a night, which equals 20 clients, at $15 per client.  Jane Doe #6 similarly reported earning $2,000 her first week, which is approximately 20 clients a night, at $15 per client.  On some occasions, the victims had sex with fewer clients.  For example, Jane Doe #2 reported that she had sex with eight clients on her first day.  The victims also all reported that the weekends were busier than the weekdays.

---

[14] Each commercial sex act typically cost the client $25 to $30.  Of that amount, $15 went to the defendants, and the remainder went to other individuals involved in the prostitution activity, such as drivers and brothel owners.

For example, Jane Doe #9 reported that the number of clients increased by 10 on the weekends.

    Based on the evidence, the average amount that the victims earned for the defendants each week was $1,050.  This very conservative estimate is reached by averaging the number of clients per weekday at 10 and the number per weekend night at 15.  Although most of the victims reported working every day, this estimate accounts for a day off.  Thus, a low estimate of the average amount earned per week, based on an average number of clients per week of 70 (10 clients x 4 weekdays + 15 clients x 2 weekend nights), at $15 earned per sex act, would be $1,050.  Accordingly, the gross value of the victims' services to the defendants under § 1593 should equal the number of months the defendants forced the victims to prostitute multiplied by $4,200 ($1,050 per week x 4 weeks per month).  Based on this calculation, restitution amounts for each victim is set forth below.

    Notably, this average is further supported by financial records that show the defendants, other members of the Organization, and their victims sending hundreds of thousands of dollars in prostitution proceeds to other members of the Organization in Mexico.  See, e.g., J. Rendon-Reyes PSR ¶ 35; S. Martinez-Rojas PSR ¶ 35.  Of course, those records do not even account for proceeds that remained in the United States or were transferred using different means, or funds documented by records that were otherwise not located or obtainable during the investigation.

I.  Jane Doe #1: $184,800

    Odilon Martinez-Rojas and his co-defendants forced Jane Doe #1 to engage in prostitution during two periods of time: (1) for approximately 24 months between January 2005 and December 2006 and (2) for approximately 20 months between May 2008 and

December 2009.  Using an average of $4,200 in prostitution proceeds a month, as calculated

above, Jane Doe #1 is entitled to $184,800 in restitution ($4,200 x 44 months).

II.      Jane Doe #2: $67,200

Saul Rendon-Reyes and his co-defendants forced Jane Doe #2 to engage in

prostitution for approximately 16 months, between January 2006 and April 2007.  Using an

average of $4,200 in prostitution proceeds a month, as calculated above, Jane Doe #2 is

entitled to $67,200 in restitution ($4,200 x 16 months).

III.     Jane Doe #3: $33,600

Jose Rendon-Garcia and his co-defendants forced Jane Doe #3 to engage in

prostitution for approximately 8 months, between March 2006 and October 2006.  Using an

average of $4,200 in prostitution proceeds a month, as calculated above, Jane Doe #3 is

entitled to $33,600 in restitution ($4,200 x 8 months).

IV.      Jane Doe #4 (SAM): $25,000

Odilon Martinez-Rojas and co-defendant Severiano Martinez-Rojas forced

Jane Doe #4 (SAM) to engage in prostitution for approximately 4 months, between

December 2007 and April 2008.  U.S. District Court Amy Totenberg for the Northern

District of Georgia ordered Odilon Martinez-Rojas and co-defendant Arturo Rojas-Coyotl to

pay Jane Doe #4 (SAM) $25,000 in restitution.[15]  NDGA Docket No. 13-CR-128.

---

[15] The evidence in that case supported an average of $30 per sex act.  Thus, the
Government argued for a restitution amount of $33,600 (70 men per week x $30 per sex act x
16 weeks).  While acknowledging that the government's calculation was conservative, Judge
Totenberg departed downward and ordered $25,000 in restitution.

V.    Jane Doe #5: $88,200

        Jovan Rendon-Reyes and his co-defendants forced Jane Doe #5 to engage in

prostitution for approximately 21 months, between June 2007 and February 2009.  Using an

average of $4,200 in prostitution proceeds a month, as calculated above, Jane Doe #5 is

entitled to $88,200 in restitution ($4,200 x 21 months).

VI.   Jane Doe #6: $117,600

        Felix Rojas and his co-defendants forced Jane Doe #6 to engage in prostitution

for approximately 28 months, between November 2007 and February 2010.  Using an

average of $4,200 in prostitution proceeds a month, as calculated above, Jane Doe #6 is

entitled to $117,600 in restitution ($4,200 x 28 months).

VII.  Jane Doe #7: $58,800

        Severiano Martinez-Rojas and his co-defendants forced Jane Doe #7 to engage

in prostitution for approximately 14 months, between November 2007 and December 2008.

Using an average of $4,200 in prostitution proceeds a month, as calculated above, Jane Doe

#7 is entitled to $58,800 in restitution ($4,200 x 14 months).

VIII. Jane Doe #8: $239,400

        Felix Rojas and his co-defendants forced Jane Doe #8 to engage in prostitution

for approximately 57 months, between April 2009 and January 2014.  Using an average of

$4,200 in prostitution proceeds a month, as calculated above, Jane Doe #8 is entitled to

$239,400 in restitution ($4,200 x 57 months).

IX.   Jane Doe #9: $214,200

        Felix Rojas and his co-defendants forced Jane Doe #9 to engage in prostitution

for approximately 51 months, between April 2010 and June 2014.  Using an average of

$4,200 in prostitution proceeds a month, as calculated above, Jane Doe #9 is entitled to $214,200 in restitution ($4,200 x 51 months).

X.      FBF, MSJ and SAM (Jane Doe #4): $190,000

The Court should order $25,000 in restitution to SAM (Jane Doe #4), $15,000 to MSJ, and $150,000 to FBF.  U.S. District Court Judge Amy Totenberg for the Northern District of Georgia ordered co-defendants Odilon Martinez-Rojas and Arturo Rojas-Coyotl to pay those amounts jointly and severally in that case.  NDGA Docket No. 13-CR-128.  The Government respectfully requests the Court to do the same for co-defendant Severiano Martinez-Rojas.

*   *   *   *   *

Due to the nature of the defendants' conspiracy, by which they aided and abetted each other in furtherance of their jointly-undertaken sex trafficking enterprise, the defendants should be ordered to pay restitution to the victims jointly and severally, in the total amount of $1,218,800, as detailed above.

<u>CONCLUSION</u>

For the reasons set forth herein, the government respectfully submits that the Court should fashion appropriately severe sentences in this case to address the grave harms these defendants inflicted during their years of operating an extended trafficking network that victimized at least a dozen young women and girls.  The defendants' conduct was utterly reprehensible, and is deserving of serious punishment for all of the reasons discussed above.

Dated:     Brooklyn, New York
           December 5, 2018

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

                              By:    /s/ Taryn A. Merkl                     
                                     Taryn A. Merkl
                                     Margaret Lee
                                     Assistant United States Attorneys
                                     (718) 254-6064

                                     Benjamin J. Hawk
                                     Deputy Director for Litigation
                                     U.S. Department of Justice
                                     Human Trafficking Prosecution Unit

cc:    Clerk of the Court (ERK) (by ECF)
       Angelica Deniz, Roberta Houlton, Jared Maneggio & Patricia Sullivan, U.S.
           Probation Department (by e-mail)
       Defense Counsel (by ECF)